Argued February 9, decided March 17, 1914.

## STETTLER v. O'HARA.*

(139 Pac. 743.)

**Constitutional Law—"Police Power."**

1.  Police power is that inherent sovereignty which it is the right and duty of the government or its agents to exercise, whenever public policy demands, for the benefit of society at large, regulations to guard its morals, safety, health, order or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires.

> [As to what is meant by "police power," see note in 78 Am. St. Rep. 236.]

**Master and Servant—Regulation of Employment—Police Power.**

2.  Laws of 1913, page 92, providing for an Industrial Welfare Commission to provide for the fixing of minimum wages and maximum hours of labor for women and minor workers, since it reasonably tends to accomplish the purpose intended, is within the police power of the state.

> [As to police power and the Fourteenth Amendment, see notes in 25 Am. St. Rep. 882, 888.]

**Master and Servant—Equal Protection of Laws—Regulation or Employment.**

3.  Though an order of the Industrial Welfare Commission created by Laws of 1913, page 92, fixes maximum hours and minimum wages of women for the City of Portland only, the law is state-wide, and does not give an employer in Portland unequal protection of the law.

> [As to equal protection of laws as a constitutional requirement, see note in 25 Am. St. Rep. 773.]

**Constitutional Law—Class Legislation—Privileges and Immunities of Citizens.**

4.  That an order of the Industrial Welfare Commission fixing minimum wages and maximum hours of labor for women, as authorized by Laws of 1913, page 92, applies only to Portland does not grant to others privileges denied to an employer in Portland in contravention of Article I, Section 20 of the Constitution.

> [As to constitutionality of statutes relating to wages of employees, see note in 139 Am. St. Rep. 863.]

---

*As to the constitutionality of legislation limiting hours of labor by women, see note in 35 L. R. A. (N. S.) 628.            REPORTER.

Constitutional Law—Distribution of Governmental Power—Delegation of Legislative Power.

　　5. Laws of 1913, page 92, authorizing the Industrial Welfare Commission to fix minimum wages and maximum hours of labor for women and minor workers after conference with representatives of employers and employees, does not delegate legislative power to the commission.

Constitutional Law—Due Process of Law—Regulation of Employment.

　　6. That Laws of 1913, page 92, authorizing the Industrial Welfare Commission to fix minimum wages and maximum hours of labor for women and minor workers, makes the findings of the commission on all questions of fact conclusive is not a deprivation of due process of law; a hearing being required for the promulgation of the commission's orders.

　　　　[As to the significance of due process of law, see notes in 24 Am. Dec. 538; 20 Am. St. Rep. 554.]

From Multnomah: THOMAS J. CLEETON, Judge.

In Banc.　Statement by MR. JUSTICE EAKIN.

This is a suit by Frank C. Stettler against Edwin V. O'Hara, Bertha Moores and Amedee M. Smith, constituting the Industrial Welfare Commission of the State of Oregon, to vacate and annul an order of the commission, and enjoin its enforcement. The facts are as follows:

On February 17, 1913, the legislative assembly passed an act entitled "To protect the lives and health and morals of women and minor workers, and to establish an Industrial Welfare Commission and define its powers and duties, and to provide for the fixing of minimum wages and maximum hours and standard conditions of labor for such workers, and to provide penalties for violation of this act." The title is followed by a declaration of the evils that it is desired to remedy, as follows:

"Whereas, the welfare of the State of Oregon requires that women and minors should be protected from conditions of labor which have a pernicious effect on their health and morals, and inadequate wages and unduly long hours and unsanitary conditions of labor have such a pernicious effect; therefore, be it enacted by the people of the State of Oregon."

The first section provides:

"It shall be unlawful to employ women or minors in any occupation within the State of Oregon for unreasonably long hours; and it shall be unlawful to employ women or minors in any occupation within the State of Oregon under such surroundings or conditions—sanitary or otherwise—as may be detrimental to their health or morals; and it shall be unlawful to employ women in any occupation within the State of Oregon for wages which are inadequate to supply the necessary cost of living and to maintain them in health; and it shall be unlawful to employ minors in any occupation within the State of Oregon for unreasonably low wages."

Then follows the creation of the commission under the name of "Industrial Welfare Commission," to be appointed by the Governor, and provisions defining its duties. Section 4 provides:

"Said commission is hereby authorized and empowered to ascertain and declare, in the manner hereinafter provided, the following things: (a) Standards of hours of employment for women or for minors and what are unreasonably long hours for women or for minors in any occupation within the State of Oregon; (b) standards of conditions of labor for women or for minors in any occupation within the State of Oregon and what surroundings or conditions—sanitary or otherwise—are detrimental to the health or morals of women or of minors in any such occupation; (c) standards of minimum wages for women in any occupation within the State of Oregon and what wages are inadequate to supply the necessary cost of living to any such women workers and to maintain them in good health; and (d) standards of minimum wages for minors in any occupation within the State of Oregon and what wages are unreasonably low for any such minor workers."

Section 8 provides, among other things, that the "commission may call and convene a conference for the purpose and with the powers of considering and in-

quiring into and reporting on the subject investigated by said commission and submitted by it to such conference. Such conference shall be composed of not more than three representatives of the employers in said occupation and of an equal number of the representatives of the employees in said occupation and of not more than three disinterested persons representing the public and of one or more commissioners,'' and the duties of such conference, which shall report the result of its investigations with recommendations to the commission.

Section 9 provides that, upon the receipt of the report from the conference, and the approval of its recommendations, the commission may make and render such order as may be proper or necessary to adopt such recommendations, and to carry the same into effect, and require all employers in the occupation affected thereby to observe and comply with such recommendations and said order. The act contains other provisions giving the commission and conference power and authority to investigate the matters being considered, and that, from the matters so determined by the commission, there shall be no appeal on any question of fact, but that there shall be a right of appeal from the commission to the Circuit Court from any ruling or holding on a question of law included or embodied in any decision or order by the commission, and from the Circuit Court to the Supreme Court. The defendants were duly appointed by the Governor as such commission. It thereafter called a conference as provided, which reported to the commission, making certain recommendations, which were approved, and based upon such recommendations it made the following order:

"The Industrial Welfare Commission of the State of Oregon hereby orders that no person, firm, corpora-

tion, or association owning or operating any manufacturing establishment in the City of Portland, Oregon, shall employ any woman in said establishment for more than nine hours a day, or fifty hours a week; or fix, allow, or permit for any woman employee in said establishment a noon lunch period of less than forty-five minutes in length; or employ any experienced adult woman worker, paid by time rates of payment, in said establishment at a weekly wage of less than $8.64, any lesser amount being hereby declared inadequate to supply the necessary cost of living to such woman factory workers, and to maintain them in health."

The amended complaint sets out all these matters in greater detail, to which the defendants demurred on various grounds, the first of which raises the questions here discussed, namely: That "it does not state facts showing that the act and order complained of is an unreasonable exercise of the police power of the state." The demurrer was sustained, and the plaintiff elected to stand on the amended complaint. Judgment was rendered dismissing the suit, and the plaintiff appeals.

AFFIRMED.

For appellant there was a brief over the name of *Messrs. Fulton & Bowerman,* with an oral argument by *Mr. Charles W. Fulton.*

For respondents there was a brief over the names of *Mr. Andrew M. Crawford,* Attorney General, *Mr. Walter H. Evans,* District Attorney, and *Messrs. Malarkey, Seabrook & Dibble,* with oral arguments by *Mr. Crawford* and *Mr. Dan J. Malarkey.*

*Mr. Joseph N. Teal,* representing the Consumer's League, filed a brief as *amicus curiae.*

*Mr. Rome G. Brown,* of Minneapolis, Minnesota, submitted a brief as *amicus curiae.*

MR. JUSTICE EAKIN delivered the opinion of the court.

The purpose of this suit is to have determined judicially whether either the Fourteenth Amendment of the Federal Constitution or Article I, Section 20, of the Oregon Constitution is an inhibition against the regulation by the legislature of the hours of labor during which women may be employed in any mechanical or manufacturing establishment, mercantile occupation, or other employment requiring continuous physical labor, or against the establishment of a minimum wage to be paid therefor. Some features of these questions are practically new in the courts of this country. There have been some utterances by the courts of last resort to the effect that it is such an inhibition. Some of these cases relate exclusively to the limitation of the hours of employment, others to the wages to be paid on contracts with the state or municipality; but the cases so holding are based largely on the fact that such regulation deprives the individual of liberty and property without due process of law, namely: That it is not within the police power of the state, and violates the liberty of contract. The first case holding such a statute unconstitutional is *Lochner* v. *New York,* 198 U. S. 45 (49 L. Ed. 937, 25 Sup. Ct. Rep. 539), annotated in 3 Ann. Cas. 1113. A similar case is *Ritchie* v. *People,* 155 Ill. 98 (40 N. E. 454, 46 Am. St. Rep. 315, 29 L. R. A. 79). In the former case, in the appellate division of the state court, two of five judges were in favor of upholding the law; in the Supreme Court of the state three of the seven judges were so minded; and in the United States court four of the nine judges favored such a disposition of the case. The opinions in those decisions are based upon very different theories, showing that judicial opinion has not reached any settled or stable basis

upon which to rest. It has only been during the last few years that the matter of legislation upon the question of the limitation of hours of labor has been agitated in legislative bodies or in the courts.. The decisions of the courts have been based upon first impression, and may be liable to fluctuation from one extreme to the other before the extent of the power of legislation on these questions is finally settled. The entry of woman into the realm of many of the employments formerly filled by man, in which she attempts to compete with him, is a recent innovation, and it has created a condition which the legislatures have deemed it their duty to investigate, and to some extent to govern. It is conceded by all students of the subject, and they are many and their writings extensive, that woman's physical structure and her position in the economy of the race renders her incapable of competing with man either in strength or in endurance. This is well emphasized by Mr. Justice BREWER in *Muller v. Oregon,* 208 U. S. 412 (52 L. Ed. 551, 28 Sup. Ct. Rep. 324, 13 Ann. Cas. 957), an appeal from Oregon questioning the constitutionality of the law fixing the maximum hours of labor for woman, where he says:

"That woman's physical structure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. This is especially true when the burdens of motherhood are upon her. Even when they are not, by abundant testimony of the medical fraternity, continuance for a long time on her feet at work, repeating this from day to day, tends to injurious effects upon the body, and, as healthy mothers are essential to vigorous offspring, the physical well-being of woman becomes an object of public interest and care in order to preserve the strength and vigor of the race. Still again, history discloses the fact that woman has always been dependent upon man. He established his control at the outset by superior physical strength, and this

control in various forms, with diminishing intensity, has continued to the present. As minors, though not to the same extent, she has been looked upon in the courts as needing especial care that her rights may be preserved. * * Differentiated by these matters from the other sex, she is properly placed in a class by herself, and legislation designed for her protection may be sustained, even when like legislation is not necessary for men, and could not be sustained. It is impossible to close one's eyes to the fact that she still looks to her brother and depends upon him; * * that her physical structure and a proper discharge of her maternal functions—having in view not merely her own health, but the well-being of the race—justify legislation to protect her from the greed as well as the passion of man. The limitations which this statute places upon her contractual powers, upon her right to agree with her employer as to the time she shall labor, are not imposed solely for her benefit, but also largely for the benefit of all. Many words cannot make this plainer. * * This difference justifies a difference in legislation, and upholds that which is designed to compensate for some of the burdens which rest upon her.''

The conditions mentioned in the above quotation lie at the foundation of all legislation attempted for the amelioration of woman's condition in her struggle for subsistence. In many of the states as well as in foreign countries special study and investigation have been given to this question as to the effect of long hours of labor and inadequate wages upon the health, morals and welfare of woman, with a view to remedy the evil results as far as possible. There seems to be a very strong and growing sentiment throughout the land, and a demand, that something must be done by law to counteract the evil effects of these conditions.

In the case of *Lochner* v. *New York,* 198 U. S. 45, (49 L. Ed. 937, 25 Sup. Ct. Rep. 539, 3 Ann. Cas. 1133), in which the constitutionality of the labor law of New

York, limiting the hours of labor in bakeries, is questioned, Mr. Justice PECKHAM wrote the opinion, holding the law invalid. Mr. Justice HARLAN filed a dissenting opinion, which should not be overlooked, as the parts here quoted are general statements of the law recognized by judicial opinion, and not in conflict with the main opinion. Justices WHITE and DAY concurred therein; Mr. Justice HOLMES also dissenting. In that opinion it is said:

"While this court has not attempted to mark the precise boundaries of what is called the police power of the state, the existence of the power has been uniformly recognized, both by the federal and state courts."

In quoting from *Patterson* v. *Kentucky,* 97 U. S. 501 (24 L. Ed. 1115), he says:

" 'It [this court] has nevertheless, with marked distinctness and uniformity, recognized the necessity, growing out of the fundamental conditions of civil society, of upholding state police regulations which were enacted in good faith, and had appropriate and direct connection with that protection to life, health, and property which each state owes to her citizens. * * But neither the [fourteenth] amendment—broad and comprehensive as it is—nor any other amendment was designed to interfere with the power of the state, sometimes termed its police power, to prescribe regulations to promote the health, peace, morals, education, and good order of the people.' * * Granting, then, that there is a liberty of contract which cannot be violated even under the sanction of direct legislative enactment, but assuming, as according to settled law we may assume, that such liberty of contract is subject to such regulations as the state may reasonably prescribe for the common good and the well-being of society, what are the conditions under which the judiciary may declare such regulations to be in excess of legislative authority and void? Upon this point there is no room for dispute, for the rule is universal

that a legislative enactment, federal or state, is never to be disregarded or held invalid, unless it be, beyond question, plainly and palpably in excess of legislative power.''

The opinions of the justices who hold the maximum hours laws unconstitutional are based largely upon the fact that they violate the liberty of contract, holding that such acts are not within the fair meaning of the term ''a health law,'' but are an illegal interference with the rights of the individual, and are not within the police power of the legislature to enact. The right of the state to prescribe the number of hours one may work or be employed on public works is generally upheld, for the reason that the state may determine for itself what shall constitute a day's work of a laborer on public works, which violates no individual right of property or liberty of contract: *Penn Bridge Co.* v. *United States,* 29 App. Cas. (D. C.) 452 (10 Ann. Cas. 720); *Byars* v. *State,* 2 Okl. Cr. 481 (102 Pac. 804, Ann. Cas. 1912A, 765); *People* v. *Chicago,* 256 Ill. 558 (100 N. E. 194, Ann. Cas. 1913E, 305, 43 L. R. A. (N. S.) 954).

So it is held that work underground or in a smelter is unhealthy, and may be regulated, in *Ex parte Boyce,* 27 Nev. 299 (1 Ann. Cas. 66, 75 Pac. 1, 65 L. R. A. 47); *Holden* v. *Hardy,* 169 U. S. 366 (42 L. Ed. 780, 18 Sup. Ct. Rep. 383); *Ex parte Kair,* 28 Nev. 127 (80 Pac. 463, 113 Am. St. Rep. 817, 6 Ann. Cas. 893); *Ex parte Kair,* 28 Nev. 425 (82 Pac. 453, 6 Ann. Cas. 893). In the Lochner case, *supra,* employment in a bakery and candy factory is held not to be unhealthy, and that a statute limiting the hours of labor therein is void. A statute fixing the hours of labor for women is held valid in *State* v. *Muller,* 48 Or. 252 (85 Pac. 855, 120 Am. St. Rep. 805, annotated in 11 Ann. Cas. 88), which case is affirmed in 208 U. S. 412 (52 L. Ed. 551, 28

Sup. Ct. Rep. 324, and annotated in 13 Ann. Cas. 957).
In *Ritchie* v. *People,* 155 Ill. 98 (40 N. E. 454, 46 Am.
St. Rep. 315, 29 L. R. A. 79), the law limiting hours of
work for women was held void.   However, in *Ritchie
& Co.* v. *Wayman,* 244 Ill. 509 (91 N. E. 695, 27 L. R. A.
(N. S.) 994), such a law was held valid as within the
police power of the legislature; and again, in *People*
v. *Chicago,* 256 Ill. 558 (100 N. E. 194, Ann. Cas. 1913E,
305, 43 L. R. A. (N. S.) 954), and in *People* v. *Elerding,*
254 Ill. 579 (92 N. E. 982, 40 L. R. A. (N. S.) 893),
the law was upheld.   Thus it appears that Illinois has
wholly receded from the decision in the case of *Ritchie*
v. *People,* 155 Ill. 98 (40 N. E. 454, 46 Am. St. Rep.
315, 29 L. R. A. 79), and it may now be considered as
established that a statute which limits the hours of
labor of certain occupations or for certain classes of
persons for the protection of the health and welfare of
society is within the police power of the state: *Com-
monwealth* v. *Riley,* 210 Mass. 387 (97 N. E. 367, Ann.
Cas. 1912D, 388); *State* v. *Somerville,* 67 Wash. 638
(122 Pac. 324).   It was said in *People* v. *Elerding,* 254
Ill. 579 (92 N. E. 982, 40 L. R. A. (N. S.) 893), wherein
a statute limiting the working hours per day for males
was held constitutional as a valid exercise of the police
power: "That under the police power of the state the
General Assembly may enact legislation to prohibit
all things hurtful to the health, welfare, and safety of
society, even though the prohibition invade the right
of liberty or property of the individual, is too well
settled to require discussion or the citation of author-
ity. * * While, in its last analysis, it is a judicial
question whether an act is a proper exercise of the
police power, it is the province of the legislature to
determine when an exigency exists calling for the exer-
cise of this power.   When the legislative authority
has decided an exigency exists calling for the exercise

of the power, an⁴ has adopted an act to meet the exigency, the presumption is that it is a valid enactment, and the courts will sustain it, unless it appears, beyond any reasonable doubt, that it is in violation of some constitutional limitation." On the same subject it is said in *Lochner* v. *New York,* 198 U. S. 45 (49 L. Ed. 937, 25 Sup. Ct. Rep. 539, 3 Ann. Cas. 1133), quoting from *Jacobson* v. *Massachusetts,* 197 U. S. 11 (49 L. Ed. 643, 25 Sup. Ct. Rep. 358, 3 Ann. Cas. 765), relating to the vaccination statute, that: "The power of the courts to review legislative action in respect of a matter affecting the general welfare exists only 'when that which the legislature has done comes within the rule that, if a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects, or is, beyond all question, a plain, palpable invasion of rights secured by the fundamental law.' * * If there be doubt as to the validity of the statute, that doubt must therefore be resolved in favor of its validity, and the courts must keep their hands off, leaving the legislature to meet the responsibility for unwise legislation." In *Re Spencer*, 149 Cal. 396 (86 Pac. 896, 117 Am. St. Rep. 137, 9 Ann. Cas. 1105), it is said:

"The presumption always is that an act of the legislature is constitutional, and, when this depends on the existence or nonexistence of some fact, or state of facts, the determination thereof is primarily for the legislature, and the courts will acquiesce in its decision, unless the error clearly appears."

The legislative power of the state is not derived by grant of the Constitution, but exists as to all subjects not inhibited by the state or Federal Constitution.

There is only one federal inhibition urged against this statute, namely:

"No state shall make or enforce any law which shall abridge the privileges or immunities of the citizens of the United States, nor shall any state deprive any person of life, liberty, or property without due process of law, or deny to any person within its jurisdiction an equal protection of the law": Fourteenth Amendment.

It may probably be conceded that the public welfare statute in question here violates this clause as abridging privileges of citizens if it cannot be justified as a police measure; and we will assume, without entering into a discussion of that question or citation of authorities, that provisions enacted by the state under its police power that have for their purpose the protection or betterment of the public health, morals, peace and welfare, and reasonably tend to that end, are within the power of the state, notwithstanding they may apparently conflict with the Fourteenth Amendment of the Federal Constitution.

1. So that the first and principal question for decision is whether the provisions of the act before us are within the police power of the state. Professor Tucker, in 8 Cyc. 863, says:

"Police power is the name given to that inherent sovereignty which it is the right and duty of the government or agents to exercise whenever public policy, in a broad sense, demands, for the benefit of society at large, regulations to guard its morals, safety, health, order or to insure in any respect such economic conditions as an advancing civilization of a highly complex character requires."

This is a comprehensive definition, and we will accept it without further detailed analysis or citation of authority.

2. As will appear from the cases cited above, we can accept as settled law statutes having for their purpose and tending to that end provision for a maximum

hours law of labor for employees upon public works, a maximum hours law for women and children employed in mechanical, mercantile or manufacturing establishments, a maximum hours law for laborers in mines or smelters, a law fixing minimum wages for employees upon public works. The latter is held in *Malette* v. *Spokane,* 77 Wash. 205 (137 Pac. 500), even where the expense is borne by private individuals, so that the only question for decision here is as to the power of the legislature to fix the minimum wage in such a case. We use the language of Mr. Malarkey: "The police power, which is another name for the power of government, is as old and unchanging as government itself. If its existence be destroyed, government ceases. There have been many attempts to define the police power and its scope; but, because of confusing the power itself with the changing conditions calling for its application, many of the definitions are inexact and unsatisfactory. The courts have latterly eliminated much of this confusion by pointing out that, instead of the power being expanded to apply to new conditions, the new conditions are, as they arise, brought within the immutable and unchanging principles underlying the power. When new conditions arise which injuriously affect the health or morals or welfare of the public, we no longer say that we will expand the police power to reach and remedy the evil. Instead we say that a new evil has arisen which an old principle of government—the police power—will correct." If the statute tends reasonably to accomplish the purposes intended by the legislature, it should be upheld by the court. Mr. Justice HARLAN, in *Jacobson* v. *Massachusetts,* 197 U. S. 11 (49 L. Ed. 643, 25 Sup. Ct. Rep. 358, 3 Ann. Cas. 765), quoting from *Viemeister* v. *White,* 179 N. Y. 235 (72 N. E. 97, 103 Am. St. Rep. 859, 1 Ann. Cas. 334, 70 L. R. A. 796), states:

"A common belief, like common knowledge, does not require evidence to establish its existence, but may be acted upon without proof by the legislature and the courts. * * The fact that the belief is not universal is not controlling, for there is scarcely any belief that is accepted by everyone. The possibility that the belief may be wrong, and that science may yet show it to be wrong, is not conclusive, for the legislature has the right to pass laws which, according to the common belief of the people, are adapted to prevent the spread of contagious diseases. In a free country, where the government is by the people, through their chosen representatives, practical legislation admits of no other standard of action, for what the people believe is for the common welfare must be accepted as tending to promote the common welfare, whether it does in fact or not. Any other basis would conflict with the spirit of the Constitution, and would sanction measures opposed to a republican form of government. While we do not decide, and cannot decide, that vaccination is a preventive of smallpox, we take judicial notice of the fact that this is the common belief of the people of the state, and, with this fact as a foundation, we hold that the statute in question is a health law, enacted in a reasonable and proper exercise of the police power."

In speaking of the Oregon ten-hour law, Mr. Chief Justice BEAN, in the case of *State* v. *Muller,* 48 Or. 252 (85 Pac. 855, 120 Am. St. Rep. 805, 11 Ann. Cas. 88), says:

"Such legislation must be taken as expressing the belief of the legislature, and through it of the people, that the labor of females in such establishments in excess of ten hours in any one day is detrimental to health, and injuriously affects the public welfare. The only question for the court is whether such a regulation or limitation has any real or substantial relation to the object sought to be accomplished, or whether it is 'so utterly unreasonable and extravagant' as to amount to a mere arbitrary interference with the right

to contract. On this question we are not without authority.''

These are some of the grounds upon which maximum ten-hour laws are sustained, and we have cited them here as applying with equal force to sustain the women's minimum wage law, and as bringing it within the police power of the legislature. The state should be as zealous of the morals of its citizens as of their health. The ''whereas clause'' quoted above is a statement of the facts or conclusions constituting the necessity for the enactment, and the act proceeds to make provision to remedy these causes. ''Common belief'' and ''common knowledge'' are sufficient to make it palpable and beyond doubt that the employment of female labor as it has been conducted is highly detrimental to public morals, and has a strong tendency to corrupt them. Elizabeth Beardsley Butler, in her ''Women of the Trades,'' says:

''Yet the fact remains that, for the vast bulk of salesgirls, the wages paid are not sufficient for self-support, and, where girls do not have families to fall back on, some go undernourished, some sell themselves. And the store employment which offers them this two-horned dilemma is replete with opportunities which in gradual, easy, attractive ways beckon to the second choice; a situation which a few employers not only seem to tolerate, but to encourage.''

The legislature of the state of Massachusetts appointed a commission known as the Commission on Minimum Wage Boards to investigate conditions. In the report of that commission in January, 1912, it is said:

''Women in general are working because of dire necessity, and in most cases the combined income of the family is not more than adequate to meet the family's cost of living. In these cases it is not optional with the woman to decline low-paid employment.

Every dollar added to the family income is needed to lighten the burden which the rest are carrying. * * Wherever the wages of such a woman are less than the cost of living and the reasonable provision for maintaining the worker in health, the industry employing her is in receipt of the working energy of a human being at less than its cost, and to that extent is parasitic. The balance must be made up in some way. It is generally paid by the industry employing the father. It is sometimes paid in part by future inefficiency of the worker herself, and by her children, and perhaps in part ultimately by charity and the state. * * If an industry is permanently dependent for its existence on underpaid labor, its value to the commonwealth is questionable.''

Many more citations might be made from the same authorities, and from such students of the question as Miss Caroline Gleason, of Portland, Oregon, Louise B. More, of New York, Irene Osgood, of Milwaukee, and Robert C. Chapin, of Beloit College. With this common belief, of which Mr. Justice HARLAN says ''we take judicial notice,'' the court cannot say, beyond all question, that the act is a plain, palpable invasion of rights secured by the fundamental law, and has no real or substantial relation to the protection of public health, the public morals or public welfare. Every argument put forward to sustain the maximum hours law, or upon which it was established, applies equally in favor of the constitutionality of the minimum wage law as also within the police power of the state and as a regulation tending to guard the public morals and the public health.

3-5. Plaintiff, by his complaint, questions the law also as a violation of Article I, Section 20, of the Constitution of Oregon. As we understand this contention, it is that the order applies to manufacturing establishments in Portland alone, that other persons in the same business in other localities are unaffected by

it, and that it is discriminatory. The law by which plaintiff is bound is contained in Section 1 of the act quoted above. If he will, he can comply with this provision without any action by the commission, and it applies to all the state alike. The other provisions of the act are for the purpose of ascertaining for those who are not complying with it what are reasonable hours of labor, and what is a reasonable wage, in the various occupations and localities in the state to govern in the application of Section 1 of the act, and for the purpose of fixing penalties for violations thereof. Counsel seem to consider the order of the commission as a law which the commission has been authorized to promulgate; but we do not understand this to be its province. Section 4 provides: "Said commission is hereby authorized and empowered to ascertain and declare * * (a) standards of hours," etc. By Section 8 it is only after investigation by the commission, and, when it is of opinion therefrom that any substantial number of women in any occupation are working unreasonably long hours or for inadequate wages, that it shall, by means of a conference, ascertain what is a reasonable number of hours for work and a minimum rate of wages, when it may make such an order as may be necessary to adopt such regulation as to hours of work and minimum wages; and Section 1 of the act shall be enforced on that basis. There is nothing in the record suggesting that there is a substantial number of women workers in the same occupation as those included in the order complained of here working unreasonably long hours or for an inadequate wage in any other locality than Portland. Other cases as they are discovered are to be remedied as provided therefor, but the law is state-wide, and it does not give to plaintiff unequal protection of the law, nor grant to others privileges denied to him; neither does it delegate legis-

lative power to the commission. It is authorized only to ascertain facts that will determine the localities, businesses, hours and wages to which the law shall apply. Counsel urges that the law upon this question interferes with plaintiff's freedom of contract, and refers to the language used in *Re Jacobs,* 98 N. Y. 98 (50 Am. Rep. 636), to wit: "Liberty, in its broad sense as understood in this country, means the right, not only of freedom from actual servitude, imprisonment, or restraint, but the right of one to use his faculties in all lawful ways, to live and work where he will," etc., as a change brought about by the larger freedom enjoyed in this country, and guaranteed by the Federal Constitution and the Constitutions of the various states in comparison with conditions in the earlier days of the common law, when it was found necessary to prevent extortion and oppression by royal proclamation or otherwise, and to establish reasonable compensation for labor; but he fails to take note that by reason of this larger freedom the tendency is to return to the earlier conditions of long hours and low wages, so that some classes in some employments seem to need protection from the same conditions for which royal proclamation was found necessary. The legislature has evidently concluded that in certain localities these conditions prevail even in Oregon; that there are many women employed at inadequate wages —employment not secured by the agreement of the worker at satisfactory compensation, but at a wage dictated by the employer. The worker in such a case has no voice in fixing the hours or wages, or choice to refuse it, but must accept it or fare worse. As is said in *Wells* v. *Great Northern Ry. Co.,* 59 Or. 165 (114 Pac. 92, 116 Pac. 1070, 34 L. R. A. (N. S.) 818, 825), as to a baggage contract printed on the ticket of a passenger:

"In this case neither was it the subject of agreement between the company and the carrier (passenger), but was imposed by the company as a condition of the sale of the ticket, and in signing the ticket the plaintiff was laboring under such an inequality of conditions as that he was compelled to enter into the contract, whether he would or not."

In the dissenting opinion in the Lochner case, *supra,* it is said:

"It is plain that this statute was enacted in order to protect the physical well-being of those who work in bakery and confectionery establishments. It may be that the statute had its origin, in part, in the belief that employers and employees in such establishments were not upon an equal footing, and that the necessities of the latter often compelled them to submit to such exactions as unduly taxed their strength. Be this as it may, the statute must be taken as expressing the belief of the people of New York that, as a general rule, and in the case of the average man, labor in excess of 60 hours during a week in such establishments may endanger the health of those who labor."

Counsel suggest it is only quite recently that it has been seriously contended that the states may lawfully establish a minimum wage in private employments. This is undoubtedly true, and it may be that there is an occasion for it. The legislature seems to have acted on the idea that conditions have changed, or that private enterprises have become so crowded that their demands amount to unreasonable exactions from women and children; that occasion has arisen for relief through its police power; and that it has determined the public welfare demands the enactment of this statute. Justice WASHINGTON, in *Ogden* v. *Saunders,* 12 Wheat. 269 (6 L. Ed. 606), says that the question which he has been examining is involved in difficulty and doubt; "but, if I could rest my opinion in favor of the constitutionality of the law on which the ques-

tion arises on no other ground than this doubt so felt and acknowledged, that alone would, in my estimation, be a satisfactory vindication of it.  It is but a decent respect due to the wisdom, the integrity, and the patriotism of the legislative body, by which any law is passed, to presume in favor of its validity, until its violation of the Constitution is proved beyond all reasonable doubt.''

6. Plaintiff further contends that the statute is void for the reason that it makes the findings of the commission on all questions of fact conclusive, and therefore takes his property without due process of law, relying on the decision of *Chicago etc. Ry. Co.* v. *Minnesota,* 134 U. S. 418 (33 L. Ed. 970, 10 Sup. Ct. Rep. 462, 702), as conclusive upon that question.  That case was an attack upon the law creating a Railway and Warehouse Commission, which was held valid by the State of Minnesota; but the United States court reversed the judgment there for the reason that the law does not provide for a hearing by the parties affected by the order, which is not due process of law, and that no notice and opportunity to be heard is provided for, which is the principal ground upon which the state court was reversed. *Louisville & N. R. Co.* v. *Garrett,* 231 U. S. 298 (58 L. Ed. —, 34 Sup. Ct. Rep. 48), is a case very much in point, in which was had a hearing before the Railroad Commission of Kentucky, fixing freight rates between certain points within the state.  The plaintiff attacked the legality of these orders because they were final and conclusive without right of appeal, and that by reason thereof plaintiff was deprived of property without due process of law.  In deciding this question, the court said:

"It [the law] required a hearing * * and a determination by the commission whether the existing rates were excessive.  But, on these conditions being fulfilled, the questions of fact which might arise * *

would not become, as such, judicial questions to be re-examined by the courts. The appropriate questions for the courts would be whether the commission acted within the authority duly conferred.''

Thus, in the present case, plaintiff was given the right and opportunity to be heard before the commission, as provided for by Section 9 of the act. In the third subdivision of the opinion in the latter case it is held that, even though the law gives no right of appeal from the final finding of facts, a party aggrieved is not without remedy as to matters that would be the appropriate subject of judicial inquiry, namely, if the rates fixed are confiscatory; but, where such a board has fully and fairly investigated and fixed what it believes to be reasonable rates, the party affected thereby has not been deprived of due process of law: *San Diego Land & Town Co.* v. *National City,* 174 U. S. 739 (43 L. Ed. 1154, 19 Sup. Ct. Rep. 804); *Spring Valley Water Works* v. *San Francisco,* 82 Cal. 286 (22 Pac. 910, 1046, 16 Am. St. Rep. 116, 6 L. R. A. 756); *Louisville & N. R. Co.* v. *Garrett,* 231 U. S. 298 (58 L. Ed. —, 34 Sup. Ct. Rep. 48). Many other cases are cited in the briefs of defendants fully supporting their contention. Due process of law merely requires such tribunals as are proper to deal with the subject in hand. Reasonable notice and a fair opportunity to be heard before some tribunal before it decides the issues are the essentials of due process of law. It is sufficient for the protection of his constitutional rights if he has notice and is given an opportunity at some state of the proceeding to be heard: *Towns* v. *Klamath County,* 33 Or. 225 (53 Pac. 604).

We think we should be bound by the judgment of the legislature that there is a necessity for this act, that it is within the police power of the state to provide for the protection of the health, morals and wel-

fare of women and children, and that the law should be upheld as constitutional.

The decree of the Circuit Court is affirmed.

AFFIRMED.

MR. CHIEF JUSTICE MCBRIDE not sitting.