## PEOPLE, PLAINTIFF AND APPELLEE, *v.* ALVAREZ, DEFENDANT AND APPELLANT.

## APPEAL from the District Court of Arecibo in a Prosecution for Violation of the Minimum Wages Act.

### No. 1490.—Decided December 9, 1920.

MINIMUM WAGES—CONSTITUTIONAL LAW.—Following the doctrine laid down in the opinion of the Supreme Court of Oregon in the case of *Stettler* v. *O'Hara*, 69 Ore. 519, affirmed by the Supreme Court of the United States by a tie vote, the Supreme Court of Porto Rico holds that the Minimum Wages Act of the Insular Legislature of June 9, 1919, is constitutional.

ID.—ID.—The fact that the said Minimum Wages Act gives no opportunity to the employer and the employee to be heard before the minimum wages is fixed does not necessarily make it unconstitutional, and in the absence of proof that a minimum wage is unreasonable or confiscatory of the employer's property it must be presumed that the legislature investigated the conditions and determined for itself what is a reasonable minimum wage.

ID.—The word "*salario*" used in the Minimum Wages Act corresponds to the word "wages" in English, meaning the stipend obtained by a workman, whether his output is measured by the time or the amount of work.

ID.—Considering the wording of the Minimum Wages Act it is necessary to conclude that the intention of the legislature was that working-women should have as near to living wages as possible; therefore the act is applicable whether the women work by the piece or by time.

ID.—INDUSTRY.—The conversion of tobacco into cigars and other things is necessarily an industry and not an agricultural occupation.

The facts are stated in the opinion.

Mr. *O. B. Frazer* for the appellant.

Mr. *José E. Figueras, Fiscal,* for the appellee.

MR. JUSTICE WOLF delivered the opinion of the court.

Fernando Alvarez, who employs women in the preparation of tobacco, was convicted and fined $20 essentially because he paid Regina Quiñones $4 for a certain week when he should have paid her $6, in violation of the Minimum Wage Law, Act No. 45 of June 9, 1919, which reads as follows:

"AN ACT ESTABLISHING MINIMUM WAGES FOR WORKINGWOMEN, AND FOR OTHER PURPOSES.

"*Be it enacted by the Legislature of Porto Rico:*

"Section 1.—That it shall be unlawful for any employer of

women, girls inclusive, in industrial occupations, or commercial, or public-service undertakings in Porto Rico, to pay them wages lower than those specified in this Section, to wit:

"Women under eighteen years of age at the rate of four (4) dollars a week, and over said age at the rate of six (6) dollars a week. The first three weeks of apprenticeship shall be exempt from the provisions of this Section. The provisions of this Act shall not be applicable to agriculture and agricultural industries.

"Section 2.—That any employer paying any woman, girls included, wages lower than those specified in Section 1 shall be guilty of misdemeanor, and upon conviction shall be punished by fine not to exceed fifty (50) dollars nor less than five (5) dollars.

"Section 3.—That the Bureau of Labor shall be intrusted with the enforcement of this Act.

"Section 4.—That all laws or parts of laws in conflict herewith are hereby repealed.

"Section 5.—That this Act shall take effect ninety days after its approval.

"*Approved June 9, 1919.*"

One of the grounds of error is that the said law is unconstitutional. While this point was not elaborately argued in the case at bar, it has been urged upon our attention with a great deal more seriousness in other cases, so that we find it convenient to treat the question in this opinion.

We find it unnecessary to review all the history of minimum wages legislation. Suffice it to say that Oregon enacted a statute fixing the minimum wage for women and children which was passed upon by the Supreme Court of that State in *Stettler* v. *O'Hara,* 69 Ore. 519; 139 Pac. 743; L. R. A. 1917–C, 944. This case of Oregon was appealed to the Supreme Court of the United States and there affirmed as the necessary consequence of a tie vote.

It is urged that such a tie vote could hardly constitute jurisprudence, but such a decision is persuasive if not binding on judges of an inferior court. We may, however, as if the principle were first before us, go a little further, because we are entirely in approval with the opinion as de-

livered by the Supreme Court of Oregon in the case of *Stettler* v. *O'Hara, supra.*

Mr. Justice Eakin in that case pointed out that the entry of women into the realm of many employments formerly filled by men in which she attempted to compete with him, was a recent innovation and created a condition which the Legislature had deemed it their duty to investigate and to some extent to govern; that it was conceded by all students of the subject, who were many, that woman's physical structure and her position in the economy of the race rendered her incapable of competing with men either in strength or in endurance; that this was well emphasized by Mr. Justice Brewer in *Muller* v. *Oregon*, 208 U. S. 412, an appeal from Oregon questioning the constitutionality of the law fixing the maximum hours of labor for women, where he said—

"That woman's physical sctructure and the performance of maternal functions place her at a disadvantage in the struggle for subsistence is obvious. This is especially true when the burdens of motherhood are upon her. Even when they are not, by abundant testimony of the medical fraternity, continuance for a long time on her feet at work, repeating this from day to day, tends to injurious effects upon the body, and as healthy mothers are essential to vigorous offspring, the physical well-being of woman becomes an object of public interest and care in order to preserve the strength and vigor of the race. Still again, history discloses the fact that woman has always been dependent upon man. He established his control at the outset by superior physical strength, and this control in various forms, with diminishing intensity, has continued to the present. As minors, though not to the same extent, she has been looked upon in the courts as needing especial care that her rights may be preserved. * * * Differentiated by these matters from the other sex, she is properly placed in a class by herself, and legislation designed for her protection may be sustained, even when like legislation is not necessary for men, and could not be sustained. It is impossible to close one's eyes to the fact that she still looks to her brother and depends upon him; * * * that her physical structure and a proper discharge of her maternal functions—having in view not merely her own health, but the well-being of the race—

justify legislation to protect her from the greed as well as the passion of man. The limitations which this statute places upon her contractual powers, upon her right to agree with her employer as to the time she shall labor, are not imposed solely for her benefit, but also largely for the benefit of all. Many words cannot make this plainer. * * * This difference justifies a difference in legislation, and upholds that which is designed to compensate for some of the burdens which rest upon her.''

Mr. Justice Eakin also quoted from the Commission on Minimum Wage Boards of Massachusetts in its report of January 1912, as follows:

''Women in general are working because of dire necessity, and in most cases the combined income of the family is not more than adequate to meet the family's cost of living. In these cases it is not optional with the woman to decline low-paid employment. Every dollar added to the family's income·is needed to lighten the burden which the rest are carrying. Whether the wages of such a woman are less than the cost of living and the reasonable provision for maintaining the worker in health, the industry employing her is in receipt of the working energy of a human being at less than its cost, and to that extent is parasitic. The balance must be made up in some way. * * *''

As· a picture of what these judges express as a reason lying at the foundation of these laws, perhaps a little citation from the testimony in this case would be pertinent.

''REGINA QUIÑONES: Q. You have agreed to work by the piece?— A. As I am a poor woman I had to take what they gave me.''

Upon being questioned by the judge she said:

''I had an understanding with Juanito, who represented the factory. I asked him for work and he gave me work. I did not make a bargain with him. I asked him to give me work and he gave it to me. We did not agree upon anything.''

Now, whether this is an absolutely true picture or not of the conditions under which the average woman in Porto Rico enters employment, it does give a graphic illustration

of the conditions portrayed by Mr. Justice Brewer and Mr. Justice Eakin.

The case of *Stettler* v. *O'Hara,* the only one in which the Supreme Court of the United States has had to deal with the Minimum Wage Law, treated of a statute which is couched in different terms from our own. In Oregon the Legislature of that State entrusted the determination of what should be the minimum wage for industries to a commission, specially appointed and which had power to notify and hear the parties interested in the matter of the minimum wage. It is argued that the Oregon law is fundamentally different from ours in that the former gives an opportunity to the employer and the employee to be heard before the minimum wage is fixed, a thing in no wise contemplated by the statute of Porto Rico. It is to be noted that the hearing and notice were fixed by the Oregon statute itself. We have been unable to find any case which declares that a rate fixed by a Legislature is unconstitutional because the parties interested in the rate fixed have not had an opportunity to be heard. On the contrary, at least where public service corporations are concerned, the rates fixed by the Legislature are presumably reasonable and it is also to be presumed that the Legislature will have investigated the conditions and determined for itself what is a reasonable minimum wage. *Louisville & Nashville Railroad Co.* v. *Garret et al.,* 231 U. S. 298, 307; authorities referred to in *Stettler* v. *O'Hara,* L. R. A. 1917 C. 953; *Detroit & Mackinac Railway Co.* v. *Michigan Railroad Commission,* 235 U. S. 402; *Northern Pacific Railway Co.* v. *State of North Dakota,* 236 U. S. 585, and notes in American Annotated Cases 1916 A, 8.

If a particular employer is convinced that a minimum wage is unreasonable or confiscatory, we are satisfied that the burden of proof is on the employer to show such unreasonableness or confiscation, things that were not attempted to be done in any of the cases submitted to us. In support

of the presumption in favor of the reasonableness of a rate fixed by the Legislature is the general principle that courts are bound to give effect to a Legislative Act unless it is clearly unconstitutional. *Ponce Lighter Co.* v. *Municipality of Ponce et al.,* 19 P. R. R. 725; *People* v. *Central Fortuna,* 22 P. R. R. 100; *People* v. *Subirá,* 27 P. R. R. 567; *People* v. *Barnés, ante,* page 853.

In further support of the constitutionality of the act is the Organic Act itself. The principle on which either hours of labor or minimum wage laws depend is that the Legislature has a right to make provisions for the safety and health of workingmen and especially of women. The appellant, to attack the constitutionality of this law, necessarily has to rely on the first paragraph of section 2 of the Organic Act, which says "that no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein the equal protection of the laws," but this is followed up in a later paragraph by the following provision:

"Nothing contained in this Act shall be construed to limit the power of the Legislature to enact laws for the protection of the lives, health or safety of employees."

The assignment of errors, however, which has been more stressed than any other is the fact that the appellant in this case, and in all the other cases submitted about the same time, was working, not for a daily wage (*jornal*), but by the piece. It is strongly maintained that the title of the act and the use of the words in the act show that the Legislature did not have in mind at all anyone who was not working on a time basis.

Porto Rico is mainly an agricultural and not an industrial community. The factories which employ women are relatively few in number and were presumably known to the Legislature in fixing the minimum rate. At the present writing we are absolutely unaware of any particular factory where

women work by the hour or by the day; but, on the contrary, we do know a great many where women work by the piece, as in the cases before us. We may not be able to take judicial notice of the labor conditions throughout the island, but the Legislature surely could take notice. Where, then, there is a relatively large body of women working by the piece we should be loath not to give them the benefit of the minimum wage law unless we were clearly satisfied that the words used by the Legislature could not apply to women working by the piece. It is true that the title of the act in Spanish contains the word *"jornal"*, but the body of the act contains the word *"salario"*, and *salario* is the most general word corresponding to wages in English which would mean the stipend obtained by a workingman, whether his output is measured by the time or the amount of work. There is no other word in Spanish which has such a general meaning as given to the ward "wages" than the word *"salario."*

Attention is drawn to the fact that the Legislature in the same session of 1919, in passing Law No. 73 regulating the hours of women and children, spoke of the maximum of hourse of work for the employees *"a jornal."* If the appellant's case is to be governed by the construction we put upon the intention of the Legislature as measured by Law No. 73, this court would be subject to no doubts. When the Legislature was fixing the hours of work for women it seems most unlikely that they mean that women who work on time should only be employed eight hours while women who work by the piece might be employed indefinitely. Any employer in this way could readily evade the hours of work for women and children.

Act No. 8, approved November 12, 1917, provides:

"That in case of discrepancy between the English and Spanish texts of a statute passed by the Legislative Assembly of Porto Rico, the text in which the same originated in either house, shall prevail in the construction of said statute, except in the following cases:

(*a*) if the statute is a translation or adaptation of a statute of the United States or of any State or Territory thereof, the English text shall be given preference over the Spanish; (*b*) if the statute is of a Spanish origin the Spanish text shall be preferred to the English; (*c*) if the matter of preference cannot be decided under the foregoing rules, the Spanish text shall prevail."

Without considering whether this law is directory rather than mandatory on the judiciary, we hold that the Minimum Wage Law under consideration was adopted from the United States and the English copy should be considered in interpreting said wage law. But even if this were otherwise, where laws are enacted in two languages courts are free to revert to either text for light in doubtful cases. *Viterbo* v. *Friedlander*, 120 U. S. 707.

In the English copy no other word is used than wages to define the stipend received by a workingman. A definition of the word "wages" is found in *In re Gurewitz*, 121 Fed. 982, where a workman was claiming preference for wages earned by piecework, where the court says on page 983:

"There is nothing ambiguous about the use of the word 'wages' in this connection, namely, for service earned within three months before the commencement of proceedings in bankruptcy. It means the agreed compensation for services rendered by the workmen, clerks or servants of the bankrupt,—those who have served him in a subordinate or menial capacity and who are supposed to be dependent upon their earnings for their present support. Whether their employer has agreed to pay them by the hour, the day, the week, the month, or by the 'job' or piece, is wholly immaterial."

The court goes on to say—

"It is incredible to suppose that Congress intended to discriminate against the vast army of laborers who, in the coal mines, the foundries, the clothing manufactories and in almost every branch of industry, are paid, not according to the time consumed but according to the work accomplished."

Similarly we find that Mr. Chief Justice Shaw in the case of *Thayer* v. *Mann*, 2 Cushing (Mass.), 374, so construed the

work done by a workingman to obtain a preference under a bankruptcy statute and this although the workingman took the work home to his house and was not under the direct supervision of his employer. See also 29 A. & E. Enc. 2nd Edit. 1085.

We have seen in our reading, although we have not the authority at hand, that a workingman, as distinct from an independent contractor, is one whose time is at the disposal of his employer. The courts have similarly construed exemption statute. 18 Cyc. 1431, and also under a workmen's compensation law, *Muncie Foundry & Machine Co.* v. *Thompson,* 123 N. E. 196.

We therefore conclude from the wording of the law the fact that there is a large body of women who work by the piece and by the other legislation of the same Legislature that the intention of the Legislature was to protect all workingwomen and to make it impossible that any employer should have a woman in his employ who earned less than six dollars a week. Whether the Legislature used the word *"jornal"*, *"salario"*, "wages" or any other word, what it must be held to have had in mind was that the workingwoman should have as near to a living wage as was reasonably possible, and that this was the intention of the Legislature in passing the Act of June 19, 1919.

The appellant also maintained and introduced testimony for that purpose, that this is not an industry but an agricultural occupation. We think that the conversion of raw tobacco into cigars and other things which changes their native status is necessarily industry or commerce and not an agricultural occupation.

The judgment appealed from must be

*Affirmed.*

Chief Justice Hernández and Justices del Toro, Aldrey and Hutchison concurred.