185 So.2d 794

Lawrence J. REYNOLDS, d/b/a
Larry & Katz

v.

**LOUISIANA BOARD OF ALCOHOLIC
BEVERAGE CONTROL.**

David Y. MARTIN, Jr., d/b/a Martin's
Wine Cellar

v.

**LOUISIANA BOARD OF ALCOHOLIC
BEVERAGE CONTROL.**

**SCHWEGMANN BROTHERS GIANT
SUPER MARKETS**

v.

**LOUISIANA BOARD OF ALCOHOLIC
BEVERAGE CONTROL.**

Nos. 47788, 47820, 47821.

Nov. 8, 1965.

On Rehearing April 1, 1966.

Further Rehearing Denied May 2, 1966.

George A. Bourgeois, Baton Rouge, for defendant-appellant.

Triche & Sternfels, Risley C. Triche, Napoleonville, for intervenors.

Stone, Pigman & Benjamin, Saul Stone, Paul O. H. Pigman, New Orleans, for appellees.

HAMLIN, Justice.

The defendant, Louisiana Board of Alcoholic Beverage Control, and intervenors, Retail Liquor Dealers Association of Louisiana, Inc., John Signorelli, John V. Ponsaa, Alcide Hughes, Ed Manthey, James Daigrepont, John Mansueto, Horace Ruiz,

Harry Rogers, Rene Dessommes, Bill Bosio, John Boesch, Jr., Louis Smith, Sr., Robert France, Henry Caranek, John Crespino, Frank Musso, Vincent Signorelli, Gene Ricca, Curry Rozas, Dudley Rozas, Boyd Gammill, Paul Gardshene, John Cicero, W. R. Motes, A. R. Knippers, Nick Cordaro, Tev Allen, John O'Keefe, Tom Bedmarski, and Fred Beam, appeal to this Court (Art. VII, Sec. 10(2), La. Const. of 1921) from judgments of the trial court which decreed Act 290 of 1964 unconstitutional; which made the rules for permanent injunctions absolute; which ordered, adjudged, and decreed that permanent injunctions issue in favor of plaintiffs, Lawrence J. Reynolds, d/b/a Larry & Katz, David Y. Martin, Jr., d/b/a Martin's Wine Cellar, and Schwegmann Brothers Giant Super Markets, and against defendant, Louisiana Board of Alcoholic Beverage Control, permanently enjoining, restraining, and prohibiting it from enforcing Act 290 of 1964; and which dismissed the petitions of intervention filed in these proceedings at intervenors' cost.

Separate but almost identical suits, attacking the constitutionality of Act 290 of 1964 and praying for injunctive relief, were filed by plaintiffs in the trial court. They were consolidated for trial, and separate but identical judgments were rendered in each matter. The cases were consolidated in this Court by formal oral motion made on the day of argument, and one judgment will be rendered herein.

Upon the filing of their suits, plaintiffs were granted temporary restraining orders; the defendant Board took suspensive appeals from the orders. On application by plaintiffs for remedial writs of certiorari, prohibition, and mandamus, the Court of Appeal, First Circuit, stated that the temporary restraining orders issued by the trial court had expired under their own terms, and the matters were remanded to the district court for further proceedings. This Court denied applications for writs. The trial court then denied plaintiffs' request for preliminary injunctions, and the matters proceeded to trial on the merits. The instant judgments, supra, ensued.

Appellant, Louisiana Board of Alcoholic Beverage Control, (joined by the Retail Liquor Dealers Association of Louisiana and a large number of service retailers, mostly single purpose dealers who deal in one commodity—principally alcoholic beverages—and adhere generally to higher markups than volume dealers) contends that the district court erred:

1. In holding that Act 290 of 1964 is unconstitutional;

2. In holding that the act is an unreasonable exercise of the police power of the State;

3. In failing to find from the law and the evidence that a problem exist-

ed in the liquor industry, that the legislature furnished the solution thereto, and that a reasonable relationship exists between the problem sought to be solved and ·the means provided to solve it;

4. In holding that plaintiffs ˙had proved the act unconstitutional; and

5. In placing on defendant the burden of proving the existence of an economic problem or other condition which moved the Legislature to act, plus the additional burden of justifying the means adopted to cope with the problem or other condition.

Appellees, volume retailers, submit to this Court that the price-fixing provisions of Act 290 of 1964 are patently unconstitutional in the light of this Court's decision in Schwegmann Brothers v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680.

In the Schwegmann case supra (1949), this Court concluded:

"From all of which we conclude that the provisions of Act 360 of 1948 which relate to the mandatory minimum mark ups (Sections 1(s), 24 and 26) do not tend, in a degree that is perceptible and clear, toward the accomplishment of the announced purpose of the statute, namely the regulation and control of the liquor traffic so that it 'may not cause injury to the economic, social and moral well-being of the people of the State.' They, in other words, are inappropriate for the achievement of the legitimate object described in the statute. Accordingly, we hold that such provisions are manifestly unreasonable within the contemplation of the state's police power, and, hence, are *unconstitutional in that they violate the due process clauses of our state and federal constitutions.*

" * * * here we are concerned only with specific mandatory mark up provisions of a particular statute, with respect to the enactment of which the police power was not validly exercised. * * * " (Emphasis supplied.)

In the instant matter, the trial judge stated:

" * * * It was Mr. Schwegmann who filed a suit in 1949 that resulted in Act 360 of 1948 being held unconstitutional by our Supreme Court insofar as that Act sought to require fixed mark-ups in the sale both at wholesale and retail of alcoholic beverages. * * * I have given a very careful line by line study of Act 360 of 1948 and Act 290 of 1964. For the life of me·I can't find any essential difference in the particular mandatory provisions, except the differences in percentages' of the mark-ups * * *.

"* * *

"* * * Also, the two Acts being exactly the same so far as the procedural provisions are concerned and the Supreme Court having passed on such procedure, I don't know any way I can get out of following that decision of Schwegmann versus the Control Board in 1949. * * *"

The trial judge denied a motion for a new trial which alleged in part that, "The Court was in error in not recognizing and taking judicial notice of the official policy of the State of Louisiana towards regulation of alcoholic beverages; the official policy is the promotion of temperance; and the Court was in error in failing to hold that Act 290 of 1964 had for its purpose the promotion of temperance, and did in fact reduce the volumes of sales, and in turn, consumption of alcoholic beverages." In denying the motion, the judge stated, "* * * I find in considering all of these phases of these cases that Act 290 of 1964 does not contain any language to indicate the promotion of moderation in the indulgence of natural appetites as being the purpose of the price regulation and neither did Act 360 of 1948. * * *"

A determination of the question of the similarity vel non of the provisions of Act 360 of 1948, which related to mandatory minimum markups (Sections 1(s), 24, and 26), with Act 290 of 1964 stands at the

threshold of this case. We, therefore, direct our immediate attention to it.

The above sections of the 1948 Act recited:

Section 1(s) "'Cost', invoice price to the dealer plus freight or cartage, if not included in the invoice, without any deduction for any discounts or concessions of any kind, plus all taxes, but not including sales tax and the emergency war tax of the United States of $3.00 per proof gallon, which became effective April 1, 1944."

Section 24. "That Board shall adopt and promulgate rules and regulations to prevent any unfair practices in the sale of any 'regulated beverages' and to enforce the following minimum mark up by every dealer over his cost:

"(a) The wholesaler's minimum selling price to a retailer shall be his cost, as herein defined, plus 15% on liquor; 20% on cordial liquers and specialties; and 25% on sparkling and still wines.

"(b) The retailer's minimum selling price shall be his cost, as herein refined, plus 33⅓% on liquor; 45% on cordials, liquers and specialties; and 50% on sparkling and still wines.

"Provided, that the rules shall prescribe that no retailer shall expose any such beverages for sale without showing the selling price thereof in easily

read figures, and it shall be unlawful for any retailer to ask or receive *any other price* for such beverages, except that the retailers shall add to said price, and collect from the purchaser, all sales taxes that may be due on each transaction.

"Provided further, that where a wholesaler bottles wine in the State, there shall be added to his 'cost', the cost of bottles and supplies plus 10% of said total.

"Provided, also, that no mandatory mark up shall be required when the transaction is between two wholesalers for resale at wholesale, or between two retailers, and that the cost for the minimum mark up on the resale in such transaction shall be the same cost as that of the original wholesaler or retailer, as hereinbefore fixed; and provided further that the provisions of this section shall not apply to sales at wholesale made in the State for export beyond its borders." (Emphasis supplied.)

Section 26. "As a condition to the sale of any dealer's product in the State, every manufacturer and every wholesaler shall file with the Board a detailed list of their selling prices, *which may be supplemented or changed from time to time, but not oftener than once in every 30 days,* in such manner as the Board may prescribe. Said lists shall be posted by the Board and distributed to all licensed dealers within the State. *No change in prices shall become effective until thirty days after the filing of notice thereof with the Board.* Provided, that no discounts or rebates of any character or amount shall be given or received from list prices." (Emphasis supplied.)

Title I, *Purposes and Definitions,* of Act 360 of 1948 recited:

"WHEREAS, it is deemed necessary for the protection of the safety, welfare, health, peace and morals of the people of the State that all traffic in alcoholic beverages containing more than six per centum of alcohol by volume be regulated and controlled, and that the police power of the State be exerted so that the said traffic may not cause injury to the economic, social and moral well-being of the people of the State, * * *."

Act 36 of 1956, "The Alcoholic Beverage Control Law," presently effective as amended, makes a statement ·identical to that set forth above; many sections of this Act are found in West's LSA:R.S. under Title 26. Act 290 of 1964 amended Chapter 1 of Title 26 "by adding thereto a new Part to be designated as Part VI thereof, to contain R.S. 26:211 through R.S. 26:219, to require and to provide for minimum prices on certain alcoholic beverages, to provide for the administration and enforce-

ment thereof and to provide for penalties for violations of said Part." Pertinent sections recite:

"§ 211. Filing of schedules required

"No wholesaler shall, after September 1, 1964, sell or offer to sell any alcoholic beverages until such wholesaler shall have filed with the Louisiana Board of Alcoholic Beverage Control a schedule in writing which shall contain, with respect to each item he proposes to sell, the exact brand or trade name, capacity of package, nature of contents, and proof. In addition, such schedule shall show the *minimum price* at which the wholesaler proposes to sell, which price shall be known as the wholesaler's list price, the *minimum price* at which the wholesaler's customers shall sell at retail in quantities of less than one case; and the *minimum price* at which the wholesaler's customers shall sell at retail in quantities of one case or more, which prices shall be known as the retailer's list price. The provisions of this Section shall not apply to any licensed wholesaler with respect to such distilled spirits and wines as has been purchased from another licensed wholesaler." (Emphasis supplied.)

"§ 212. Wholesaler's list price

The wholesaler's list price of distilled spirits shall not be in *an amount less than* his cost price, plus a markup of at least ten per cent of such cost price. The wholesaler's list price of wine shall not be in *an amount less than* his cost price, plus a markup of at least eighteen per cent of such cost price. The wholesaler's cost price shall be his actual net invoice cost price as shown by the duplicate invoice on file with the board, inclusive of bottling charges and all other charges paid for the distilled spirits or wines, plus all taxes, plus all transportation charges calculated on *a minimum basis* of not less than fifty cents per case. The provisions of this Section shall not apply to any licensed wholesaler with respect to such distilled spirits and wines as has been purchased from another licensed wholesaler." (Emphasis supplied.)

"§ 213. Retailer's list price

The retailer's list price of distilled spirits *shall not be less than* the retailer's cost price, plus, where sales are made in quantities of less than one case, a markup of at least twenty per cent of the retailer's cost price, or plus; where sales are made in quantities of one case or more, a markup of at least ten per cent of the retailer's cost price. The retailer's list price of wines *shall not be less than* the retailer's cost price, plus, where sales are made in quantities of less than one case, a markup of at least thirty per cent of the retailer's cost price, or plus; where sales are made in

quantities of one case or more, a mark-up of at least fifteen per cent of the retailer's cost price. The retailer's cost price shall be the wholesaler's list price, excluding municipal or parish gallonage tax on distilled spirits and wines." (Emphasis supplied.)

"§ 214. Amendment of schedules

Any wholesaler may amend his schedule on file with the board at any time, provided the amendment does not reduce either the wholesaler's list price or the retailer's list price below the *minimum prices* provided in Sections 212 and 213 hereof. All amended schedules shall become effective immediately upon being filed, except that where such an amended schedule includes a new brand of alcoholic beverage not previously sold by such wholesaler the schedule shall not become effective for a period of thirty days after it has been filed with the board." (Emphasis supplied.)

"§ 215. Sale below list price unlawful

A. No wholesaler shall sell or offer to sell any alcoholic beverages to any retailer nor shall any retailer buy or offer to buy any alcoholic beverages from any wholesaler *at a price below* a wholesaler's list price.

B. No retailer shall sell or offer to sell any alcoholic beverages *at a price below* the retailer's list price.

C. All distilled spirits and wines owned by any retailer or wholesaler in Louisiana, after September 1, 1964, shall be sold by such wholesaler or retailer *at prices not less than* the first list price shown on the schedule filed by the wholesaler distributing such distilled spirits or wines after September 1, 1964.

Notwithstanding the provisions of this Section, any licensed wholesaler may sell any distilled spirits and wines purchased from another wholesaler *for a price not less than* the wholesale list price of the selling wholesaler." (Emphasis supplied.)

Act 360 of 1948 contained mandatory mark up provisions. It also contained mandatory posting provisions in Sec. 26, supra; the manufacturer and the wholesaler were bound by the postings for a period of thirty days. Act 290 of 1964 sets a floor on prices; it sets a *minimum price* under which dealers cannot sell; it requires no posting and provides that the wholesaler under certain conditions may amend his schedule at any time. Act 290 does not order the retailer to show prices on exposed beverages. Section 24(b) of Act 360 of 1948 ordered the retailer to show prices on exposed beverages and provided that it would be unlawful for any retailer to ask or receive *any other price* for such beverages.

Similarities do exist in the two Acts; but, since both Acts treat of price control, it

follows that they are bound to contain similarities. Act 290 of 1964 is a comprehensive statute; it is definitive in its terms; its mark up provisions vary in great degree from the assailed sections of the 1948 Act.

We do not find that Act 360 of 1948 (Secs. 1(s), 24, and 26) and Act 290 of 1964 are identical. Therefore, in the light of Schwegmann Brothers v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, we are not precluded from further consideration of the errors herein assigned, supra, to the judgments of the trial court.

In attacking the constitutionality of Act 290 of 1964, plaintiffs contended in their petitions that it violated Art. III, Sec. 1, and Art. I, Sec. 2, La.Const. of 1921, and the Fourteenth Amendment to the United States Constitution, in that the Act unlawfully delegated rights and powers to producers to fix certain prices and define certain crimes and criminal conduct punishable under the provisions of the Act.

We find the above constitutional attack without merit for reasons which will be hereinafter stated, and for the further reason that plaintiffs have not urged the contention herein. As stated supra, plaintiffs rely on the 1949 Schwegmann case which, as stated supra, held that certain sections of the 1948 Act violated the due process clause of the Louisiana and Federal Constitutions. In their petitions plaintiffs

seriously urged that Act 290 of 1964 is unconstitutional because it deprives them and others similarly situated of due process of law. They contend in brief that "The 1964 minimum price-fixing liquor law, like the 1948 law, is unconstitutional because it violates the due process clauses of the Louisiana Constitution and the United States Constitution. * * * Every reason which led the Court to invalidate the 1948 price-fixing law applies with equal force to the 1964 law."

The business of manufacturing and selling intoxicating liquors is one which the State controls. In the early case of State v. Nejin, 140 La. 793, 74 So. 103 (1917), this Court stated:

"* * * The law upon the question thus presented is well stated as follows:

"'The entire business of manufacturing and selling intoxicating liquors is completely within the control of the state, and there is nothing in the Constitution of the United States to prevent it from regulating and restraining the traffic, or from prohibiting it altogether.' 6 R.C.L. § 271."

In Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887), the United States Supreme Court, in discussing certain statutes of the State of Kansas relating to the manufacture and sale of intoxicating liquors, stated:

"* * * Nor can legislation of that character come within the fourteenth amendment, in any case, unless it is apparent that its real object is not to protect the community, or to promote the general well-being, but, under the guise of police regulation, to deprive the owner of his liberty and property, without due process of law. * * *"

In Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128 (1939), the United States Supreme Court further stated:

"The Twenty-first Amendment sanctions the right of a state to legislate concerning intoxicating liquors brought from without, unfettered by the Commerce Clause. Without doubt a state may absolutely prohibit the manufacture of intoxicants, their transportation, sale, or possession, irrespective of when or where produced or obtained, or the use to which they are to be put. Further, she may adopt measures reasonably appropriate to effectuate these inhibitions and exercise full police authority in respect of them. * * *"

1. The Twenty-first Amendment (1933) to the Constitution of the United States provides: "Sec. 2. The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof, is hereby prohibited."

The United States Supreme Court reaffirmed its view as late as 1964 in Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L.Ed.2d 350, saying:

"This view of the scope of the Twenty-first Amendment [1] with respect to a State's power to restrict, regulate, or prevent the traffic and distribution of intoxicants within its borders has remained unquestioned. See [State of] California v. [State of] Washington, 358 U.S. 64, 79 S.Ct. 116, 3 L.Ed.2d 106. Thus, in Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128, there was involved a Kentucky statute, a long, comprehensive measure (123 sections) designed rigidly to regulate the production and distribution of alcoholic beverages through means of licenses and otherwise. The manifest purpose is to channelize the traffic, minimize the commonly attendant evils; also to facilitate the collection of revenue. To this end manufacture, sale, transportation, and possession are permitted only under carefully prescribed conditions and subject to constant control by the state.' * * *" [2]

2. The Hostetter case held that while the Twenty-first Amendment permits a state to restrict the importation of intoxicants destined for consumption within its borders, it does not give the states exclusive control over commerce in intoxicating liquors. The case affirmed Idlewild Bon-Voyage Liquor Corp. v. Epstein, et al., D.C., 212 F.Supp. 376.

A citizen does not possess the inherent right to sell intoxicating liquors, but our Court has recognized that the business of selling intoxicating liquors is a lawful calling. It has also recognized that the liquor business is associated with inherent evils, and, because of this fact, the business may have imposed on it regulations more stringent than on other businesses.

"Our organic law therefore secures to every citizen the right to earn his livelihood in any lawful calling, unless he is deprived of that right by due process of law, and it recognizes the business of selling intoxicating liquors as a lawful calling by conferring upon the General Assembly the right to regulate rather than to prohibit it; and, conformably to the mandate thus conferred, the General Assembly recognizes it as a lawful calling by including it among other callings, for the pursuit of which it authorizes the issuance of licenses, and by making no attempt to prohibit it, * * *.

"* * *

"* * * A statute of this state imposing conditions upon the business of selling intoxicating liquors, though such conditions be more onerous than those imposed upon another business, may be sustained because the business of selling intoxicating liquors more seriously affects the health, morals, and general

welfare of the public than another business; * * *." State ex rel. Galle v. City of New Orleans, 113 La. 371, 36 So. 999, 67 L.R.A. 70 (1904); See, Idlewild Bon-Voyage Liquor Corp. v. Epstein, 212 F. Supp. 376, 377.

"The proposition is generally accepted that there is no inherent right in a citizen to sell intoxicating liquor, and the business may be permitted under conditions such as will limit to the utmost the evils associated therewith. * * * Due to the nature of the business, the governing authorities may impose regulations on it more stringent than on other businesses, State ex rel. Galle v. City of New Orleans, 113 La. 371, 36 So. 999, 67 L.R.A. 70, 2 Ann.Cas. 92, and while constitutional guarantees cannot be transgressed, it is settled that the enjoyment of all rights is subject to the police power and reasonable regulations enacted pursuant thereto. 11 Am.Juris., verbo Constitutional Law, Section 267, p. 1006." City of Baton Rouge v. Rebowe, 226 La. 186, 75 So.2d 239, (1954).

The power to regulate the liquor business resides within the State under its police power. Art. XIX, Sec. 18, La.Const. of 1921. "* * * the right to regulate the traffic of liquor is an inherent police power of the state which, under the express provisions of Section 18 of Article XIX of the Constitution of 1921 can never be

surrendered, * * *." State v. Gardner, 198 La. 861, 5 So.2d 132 (1941). "The state may, under its police powers, enact laws regulating the liquor traffic, or it may prohibit the traffic altogether, either statewide or in specified localities, and such statutes are constitutional. * * *" City of Bogalusa v. Gullotta, 181 La. 159, 159 So. 309 (1935).

The exercise of the police power in the enactment of laws must be valid, and the restrictions it imposes must be reasonable. "The test to be applied in determining whether there has been a valid exercise of the police power in the constitutional sense is 'to inquire whether the restrictions it imposes on rights secured to individuals by the Bill of Rights are unreasonable, and not whether it imposes any restrictions on such rights. * * * The validity of a police regulation therefore

primarily depends on whether under all the existing circumstances the regulation is reasonable or arbitrary and whether it is really designed to accomplish a purpose properly falling within the scope of the police power.' 11 Am.Juris. verbo Constitutional Law, Sec. 302, pp. 1074, 1075; see, also, Schwegmann Bros. v. Louisiana Board of A.B.C., 216 La. 148, at p. 170, 43 So.2d 248, 14 A.L.R.2d 680; City of De-Ridder v. Mangano, 186 La. 129, 171 So. 826." City of Baton Rouge v. Rebowe, 226 La. 186, 75 So.2d 239 (1954). "Price control, like any other form of regulation, is unconstitutional only if arbitrary, discriminatory, or demonstrably irrelevant to the policy the Legislature is free to adopt, and hence an unnecessary and unwarranted interference with individual liberty." Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940.[3]

---

3. In the Nebbia case, the following pertinent statements were made:—

"So far as the requirement of due process is concerned, and in the absence of other constitutional restriction, a state is free to adopt whatever economic policy may reasonably be deemed to promote public welfare, and to enforce that policy by legislation adapted to its purpose. The courts are without authority either to declare such policy, or, when it is declared by the legislature, to override it. * * * 'Whether the free operation of the normal laws of competition is a wise and wholesome rule for trade and commerce is an economic question which this court need not consider or determine.' Northern Securities Co. v. United States, 193 U.S. 197, 337, 338, 24 S.Ct. 436, 457, 48 L.Ed. 679 [700, 701]. And it is equal-ly clear that if the legislative policy be to curb unrestrained and harmful competition by measures which are not arbitrary or discriminatory it does not lie with the courts to determine that the rule is unwise. With the wisdom of the policy adopted, with the adequacy or practicability of the law enacted to forward it, the courts are both incompetent and unauthorized to deal. The course of decision in this court exhibits a firm adherence to these principles. Times without number we have said that the Legislature is primarily the judge of the necessity of such an enactment, that every possible presumption is in favor of its validity, and that though the court may hold views inconsistent with the wisdom of the law, it may not be annulled unless palpably in excess of legislative power.

"If the laws passed are seen to have a reasonable relation to a proper legislative purpose, and are neither arbitrary nor discriminatory, the requirements of due process are satisfied, and judicial determination to that effect renders a court *functus officio."* Nebbia v. People of State of New York, supra. See, Lionel's Cigar Store v. McFarland, 162 La. 956, 111 So. 341; Mouledoux v. Maestri, 197 La. 526, 2 So. 2d 11.

In the 1949 Schwegmann case, we observed that the announced object or purpose of Act 360 of 1948 was to regulate and control, under the police power, all traffic of alcoholic beverages containing more than six per centum of alcohol by volume. We said that such was clearly stated in the Act's preamble. Applying the test of the language of the 1948 Act, supra, to the effect that liquor traffic may not cause injury to the economic, social, and moral well-being of the people of the State, we asked, "Is there a real and substantial relation between the mandatory minimum mark ups of the statute and the preventing of injury to the economic, social and moral well being of the people of the state? Are those means (the mark ups) reasonably necessary and appropriate for the accomplishment of the legitimate object or purpose which the statute announces (regulation and control of the traffic)?" We believe that the same questions can be asked herein.

The evidence of record in the instant case discloses that prior to the passage of Act 290 of 1964 (sixteen years after the Act of 1948), some deals, discounts, and gratuities took place in some portions of the liquor trade; there were occasional price wars and some ruinous competition; a great number of liquor retail sales had only a 6% mark up; the sales of certain volume retailers ran as high as $2,000,000.00

"The lawmaking bodies have in the past endeavored to promote free competition by laws aimed at trusts and monopolies. The consequent interference with private property and freedom of contract has not availed with the courts to set these enactments aside as denying due process. Where the public interest was deemed to require the fixing of *minimum prices,* that expedient has been sustained. If the lawmaking body within its sphere of government concludes that the conditions or practices in an industry make unrestricted competition an inadequate safeguard of the consumer's interests, produce waste harmful to the public, threaten ultimately to cut off the supply of a commodity needed by the public, or portend the destruction of the industry itself, appropriate statutes passed in an honest effort to correct the threatened consequences may not be set aside because the regulation adopted fixes prices reasonably deemed by the Legislature to be fair to those engaged in the industry and to the consuming public. And this is especially so where, as here, the economic maladjustment is one of price, which threatens harm to the producer at one end of the series and the consumer at the other. The Constitution does not secure to any one liberty to conduct his business in such fashion as to inflict injury upon the public at large, or upon any substantial group of the people. * * *" (Emphasis supplied.)

(Reynolds) and $5,000,000.00 (Schwegmann) per year; volume retailers advertised several brands of alcoholic beverages at retail prices slightly above the wholesale cost of service retailers for the same brands. The evidence further shows that since the passage of Act 290 of 1964, consumption of alcoholic beverages has dropped in certain instances; no more deals, low mark up selling with price appeal, price wars or ruinous competition exist.

We are compelled to conclude that the factors which existed in the liquor trade prior to the enactment of Act 290 of 1964 were detrimental to the economic welfare of the liquor traffic or business; price structure at both retail and wholesale levels was a primary source of trouble to a large number of dealers. It was imperative that the economic welfare of the liquor business be stabilized; such conditions as are herein evidenced may not have been prevalent in 1948, sixteen years before. We are constrained to conclude that the price structure adopted by Act 290 of 1964 is related to the economic welfare of the sale of alcoholic beverages and is reasonable in its application.

Emphasis is placed by appellant Board upon the fact that Act 290 of 1964 had for one of its primary purposes the bringing about of *temperance* in the consumption of intoxicating liquors. Since the Act was merely an amendment to West's

LSA–R.S., it was not necessary that such purpose be stated, Buras v. Orleans Parish Democratic Executive Com., 248 La. 203, 177 So.2d 576; it was not so stated. We, therefore, direct to ourselves the question of whether a reasonable relationship exists between (a) the purpose of bringing about temperance in the consumption of intoxicating liquors, and (b) the means adopted to accomplish such purpose, namely, a minimum price control act.

Webster's New World Dictionary of the American Language, College Edition, defines temperance as follows:

"n. * * * moderation, sobriety * * * 1. the state or quality of being temperate; self-restraint in conduct, expression, indulgence of the appetites, etc; moderation, originally as one of the four cardinal virtues. 2. moderation in eating and drinking, especially in drinking alcoholic liquors. 3. total abstinence from alcoholic liquors. * * * "

The following pronouncements from decisions of other states (although we are not bound by them) are pertinent:

" * * * The liquor traffic has long been recognized as a source of danger to the public welfare, health and safety, and regulations governing the conduct of the business and frequently going to the extent of prohibiting it altogether have been sustained. Boston Beer Co.

v. [Commonwealth of] Massachusetts, 97 U.S. 25, 32, 24 L.Ed. 989; Mugler v. State of Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; * * *.

"The power of the State to protect itself by an exercise of the police power is commensurate with the nature of the evil which it seeks to eliminate. If the Legislature came to the conclusion that the establishment of retail prices for customers of package stores would tend to *promote temperance*, to stabilize the package store business, to avoid price wars and cut throat competition, and to instill more observance for the law in those engaged in the business and would better protect the public, we cannot say its belief was so irrational that none of these objects would result from the passage of the act." (Emphasis supplied.) Supreme Malt Prod. Co. v. Alcoholic Beverages C. Com'n., 334 Mass. 59, 133 N.E.2d 775.

"The proof shows that due to price-cutting and to cut-throat competition by producers, wholesalers and retailers, chaos existed in the trade which resulted in law violations, excessive use of intoxicants and other conditions detrimental to the commonwealth. The evidence is to the effect that the fixing of minimum prices has had a stabilizing effect upon the industry, done away with ruinous competition, resulted

in *less consumption of intoxicants* by the public and has caused liquor to be sold in more wholesome surroundings." Reeves v. Simons, 289 Ky. 793, 160 S. W.2d 149. (Emphasis supplied.)

" * * * The establishment of retail prices for customers of retail stores is an exercise of the police power in order *to promote temperance*, to stabilize the business, to avoid price wars, to instill observance of the law, and to protect the public. * * *" Kneeland Liquor, Inc. v. Alcoholic Beverages Con. Com'n, 345 Mass. 228, 186 N.E.2d 593. (Emphasis supplied.)

"Although the act here in question does not contain a statement of the objects sought to be accomplished, the purposes which the General Assembly had in mind in adopting it are easily discernible. They *were both to promote temperance* in the consumption of intoxicating liquor and, by stabilizing the industry, to encourage observance of the Liquor Control Act by those who are permitted to sell liquor not to be consumed on the premises. It may reasonably be presumed that, without the establishment of a *minimum retail price* for branded liquor, price wars among retail dealers are apt to occur. The cutting of prices which occurs during such wars may induce persons to purchase, and therefore consume, more liquor than they would if higher

prices were maintained. Moreover, the cutthroat competition which ensues is apt to induce the retailers to commit such infractions of the law as selling to minors and keeping open after hours in order to withstand the economic pressure. To prevent the occurrence of such conditions *promotes public health, safety and welfare.* Like all reasonable restrictions on the liquor traffic, such a purpose is well within the police power of the state. * * *

"To accomplish this purpose, the General Assembly has, in this instance, adopted the method of permitting wholesalers to fix minimum prices at which each brand of liquor may be sold at retail. Price fixing is well recognized as a method reasonably suited to effectuate such a purpose and, therefore, *is not a violation of due process.* * * * Clearly, the act which requires wholesalers as a condition of doing business in this state to schedule minimum prices at which their brands of liquor may be sold and prohibits permittees from selling at retail for less than those prices is within the police

power of the state." Schwartz v. Kelly, 140 Conn. 176, 99 A.2d 89.[4] (Emphasis supplied.)

In the light of the above jurisprudence and evidence of record, we conclude that the purpose of *temperance,* urged by appellant Board to be a purpose of Act 290 of 1964 (the wisdom and appropriateness of which does not concern us), has a direct relationship with a minimum price control act. In other words, there is a direct relationship between the purpose—curtailing the consumption of liquor—and the means adopted to accomplish it. Appellant Board well states in brief:

"As a result of the ruinous competitive practices at the local level in the industry, the industry had become demoralized, chaotic, and unstabilized. An effort by the legislature regulating pricing would surely tend to stabilize, rebalance the industry, and bring about an orderly market, so as to foster temperance in consumption. One may say that no matter what price alcoholic beverages are sold, people will continue to buy them. This is true, but they will not buy as much of them, and if the

---

4. The Schwartz case was cited in State v. Hughes, 3 Conn.Cir. 181, 209 A.2d 872, wherein the court, in discussing a liquor law which prohibited the sale of intoxicants to minors, stated:— " * * * The law was manifestly directed at the eradication, or minimally at the discouragement, of alcoholic indulgence by minors who, lacking self-discipline, fortitude and discretion, and uninformed by their own observation and the experience gained by maturing years, were most likely to fall into habits of dissolute excess and vice, with grave injury to themselves, and resulting progressively in a sapping decadence in the moral sinews and the lofty aims of a resolute, determined and evolving society. * * * "

idea of a bargain can be separated from the purchase of such beverages, much temperance will be fostered in these people."

"Under familiar principles of constitutional law, the validity of a statute is presumed. It is the duty of the court to uphold a statute unless it clearly violates the organic law. Any doubt must be resolved in favor of the validity of a solemn expression of the legislative will." Police Jury of Parish of St. Charles v. St. Charles Par. Waterworks Dist. No. 2, 243 La. 764, 146 So.2d 800. See, Buras v. Orleans Parish Democratic Executive Com., 248 La. 203, 177 So.2d 576; Schwegmann Bros. Giant Super Markets v. McCrory, 237 La. 768, 112 So.2d 606. It is also a familiar principle of constitutional law that one who attacks the constitutionality of a statute has the burden of showing by clear and cogent evidence that the statute is unconstitutional. Kansas City Southern Railway Company v. Reily, 242 La. 235, 135 So.2d 915; Interstate Oil Pipe Line Co. v. Guilbeau, 217 La. 160, 46 So.2d 113; 16 C.J.S. Constitutional Law § 99, p. 388. Price control acts are not per se unconstitutional. See, Pickerill v. Schott, Fla., 55 So.2d 716, Gipson v. Morley, 233 S.W.2d 79, 30 Am.Jur., Intoxicating Liquors, Sec. 36, p. 550; Schwegmann Bros. Giant Super Markets v. McCrory, supra; Louisiana Wholesale Distributors Ass'n v. Rosenzweig, 214 La. 1, 36 So.2d 403. The burden herein rested upon the plaintiffs to show the unconstitutionality of Act 290 of 1964. We do not find that they have met their burden; in fact, their testimony reflects that they have experienced somewhat of a drop in sales since the adoption of Act 290; however, the evidence does not reflect that they will be put out of business, nor does it reflect that the effect of the Act is confiscatory. In our opinion, a drop in sales tends to show that some temperance has been accomplished.

We conclude that Act 290 of 1964 is reasonable and that it is a valid exercise of the legislative will under its police power for the protection of the safety, welfare, health, peace, and morals of the people of the State of Louisiana. Its minimum price provisions, as stated supra, are definitely related to the purpose which the Act seeks to accomplish. Act 290 of 1964 violates neither the due process clause of the Louisiana State Constitution nor the Fourteenth Amendment to the United States Constitution.

For the reasons assigned, the judgments of the trial court in these consolidated cases are reversed and set aside; the suits of plaintiffs are dismissed at their costs.

HAMITER, Justice (dissenting).

Initially, I am compelled to take issue with the conclusion of the majority herein that the provisions of Act 290 of 1964 are so materially different from those of Act 360 of 1948 that our decision in

Schwegmann Brothers v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680, is not controlling here. In reaching such conclusion the majority refer to Sections 24 and 26 of the 1948 statute and seem to suggest that somehow the requirements relative to posting and listing prices with the Board made that act more of a price setting act, rather than a mandatory minimum mark-up statute such as the one involved here, thus rendering inapplicable the initial Schwegmann decision.

In my opinion the 1948 act was nothing more than a mandatory minimum mark-up law—in every essential particular the same as the 1964 act—and Sections 24 and 26 thereof (relied on by the majority to distinguish the statutes) contained language designed merely to facilitate the enforcement of the mark-up provisions.

Throughout the opinion in the original Schwegmann case the 1948 act was treated (and its validity determined) on the basis of its being only a minimum mark-up statute; in no less than four places therein the statute as a whole, and Sections 24 and 26 in particular, are referred to as providing for mandatory minimum mark-ups; and it was pointed out that the attack made on the statute was that mandatory minimum mark-ups, under the circumstances existing at that time, violated due process of law.

Nowhere in the opinion therein, or in the briefs of counsel, was it suggested that the matter of the price posting and the listing provisions was ever at issue. To the contrary, throughout its brief the defendant, Alcoholic Beverage Control Board, reiterated time and time again that the 1948 act, including Sections 24 and 26, *was merely a minimum mark-up law.* [Thus, to point out but two instances, the Board asserted in its brief: "It is thus apparent that the Statute does not, by the widest stretch of imagination, fix the prices at which liquor shall be sold in Louisiana. * * * All this statute has done is to require a minimum wholesale and retail mark-up by the wholesaler and retailer, over their cost. * * * Act 360 of 1948 is not a price-fixing statute at all, Section 24 providing merely a regulatory mark-up for dealers, irrespective of price."]

Furthermore, with all due respect to the majority I cannot agree with the finding of fact relative to conditions in the industry prior to the enactment of the 1964 statute or that the situation differed materially from that which had existed prior to the enactment of the 1948 act as shown in the original Schwegmann opinion. At page 802 of the majority opinion herein it is said: "The evidence of record in the instant case discloses that prior to the passage of Act 290 of 1964 (sixteen years after the Act of 1948), some deals, discounts, and gratuities took place in some

portions of the liquor trade; there were occasional price wars and some ruinous competition; * * *."

Prior to the passage of the 1948 act, the same "deals" (lower prices on bulk purchases), discounts and gratuities were operative in the trade, and, as we pointed out in the opinion relative to that statute, there was also some evidence of isolated cases of price wars. The present record shows only one price war, that in the Shreveport area. With regard to the existence of "ruinous competition", the evidence, as I appreciate it, forces me to conclude that it was not "ruinous" but merely competitive and to no greater extent than prior to 1948. In this connection it is pertinent to note that the number of retail liquor outlets, rather than diminishing as would be the case if the competition were ruinous, increased steadily from the 1930's to the 1960's. All of the retail dealers who testified *for the defendant* (most of whom had been in business for many years) almost without exception admitted that they had prospered. [For instance, Mr. Anthony Cardaro and his partner started in business in Shreveport some thirteen years prior to the trial with approximately $4,500. About seven years later they incorporated with a capitalization of $70,000, meanwhile having acquired out of their profits the building, worth $25,000, in which they operated; and each of them was drawing $800 per month from the

business plus $200 for rent for the building.]

But even conceding arguendo the above facts as found by the majority to be correct, there is no evidence whatever to show that the results intended to be reached by the statute would be to the economic interest and welfare of the community and to its people as a whole. In fact, the majority opinion suggests that the statute was enacted for the benefit of the liquor business generally and the small liquor dealers particularly—a benefit to be rendered at the expense of the consumers who are compelled to pay higher prices. Thus, it is said therein "We are compelled to conclude that the factors which existed in the liquor trade prior to the enactment of Act 290 of 1964 were detrimental to the economic welfare of the liquor traffic or business; price structure at both retail and wholesale levels was a primary source of trouble to a large number of dealers. It was imperative that the economic welfare of the liquor business be stabilized; such conditions as are herein evidenced may not have been prevalent in 1948, sixteen years before. We are constrained to conclude that the price structure adopted by Act 290 of 1964 is related to the economic welfare of the sale of alcoholic beverages and is reasonable in its application."

There is no suggestion that the mentioned factors and conditions were operating to the economic disadvantage of the

citizens as a whole. As a consequence the result reached by the majority—permitting interference by the state with the operation of a lawful business merely for the benefit of one kind of business or the special interest involved therein—completely contravenes our observation made in City of Alexandria v. Hall, 171 La. 595, 131 So. 722, as approved in Schwegmann Brothers v. Louisiana Board of Alcoholic Beverage Control, supra, which was: " 'To justify the state in thus interposing its authority in behalf of the public, it must appear, first, that the interests of the public generally, as distinguished from those of a particular class, require such interference; and, second, that the means are reasonably necessary for the accomplishment of the purpose, and not unduly oppressive upon individuals. The Legislature may not, under the guise of protecting the public interests, arbitrarily interfere with private business, or impose unusual and unnecessary restrictions upon lawful occupations.' "

With respect to whether or not the 1964 statute in its application tended to promote temperance I can find, after scrutinizing the record very carefully, *no* evidence that consumption declined generally in the period following the effective date of the act. True, two of the large retail distributors who are plaintiffs herein indicated that their sales had dropped. However, it is clear from their testimony that this was not because the consumers were buying less

but, rather, that they were buying in stores more conveniently located after the price advantage at the larger store was no longer available. Moreover, the third plaintiff and *all* of the small retailers from throughout the state who were called as witnesses by the defendant testified that their volume had increased materially and two of them volunteered that they were now doing a "case business" which they had not done before.

From these facts it is obvious that the 1964 statute does not, any more than did the 1948 act, tend in any perceptible degree toward its asserted purpose, namely, the regulation and control of liquor so that it may not cause injury to the economic, social and moral well being of the *people of the state generally*. And in this regard it should be observed that the factors referred to by us in the original Schwegmann decision, as showing that the 1948 act did not have such effect, are equally applicable to the statute presently under consideration. (Incidentally, neither statute was designed to control prices of beer or bar drinks nor to bring within its orbit the prices charged by the manufacturer or distiller.)

If this 1964 statute were actually one to control, regulate or even prohibit the sale and distribution of intoxicating liquors, this in the interest and general welfare of all of the people of Louisiana, I would then be of the opinion that it represents a proper

exercise of the state's police power and, accordingly, I would gladly vote to maintain its constitutionality. But it is not such a statute. As pointed out above it obviously evidences a quarrel or fight respecting price fixing among liquor interests exclusively—one that produces a result contrary to the principles of the American free enterprise system—and I cannot in good conscience advocate or support the sustaining of its validity.

I respectfully dissent.

SANDERS, Justice (dissenting).

I can see no substantial difference between Act 290 of 1964 and the 1948 statute that this Court struck down in Schwegmann Brothers v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680 (1949). Nor can I find any significant change in the basic economic factors since that decision. Hence, in my opinion, the previous decision requires that the present statute be declared unconstitutional.

The statute has no real or substantial relation to temperance in the use of alcoholic beverages. Rather, it is designed to eliminate price competition in the market by fixing a minimum price. The statute simply chops away another section of our free enterprise system. As Justice Brandeis aptly warned, "No system of regulation can safely be substituted for the operation of individual liberty as expressed in competition."

I respectfully dissent.

SUMMERS, Justice (dissenting).

I find no distinction between the intent, purpose and effect of Act 360 of 1948, which was declared unconstitutional by this court in 1949 (Schwegmann Brothers v. La. Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680), and the intent, purpose and effect of Act 290 of 1964 presently under consideration. The distinctions relied upon by the majority to avoid the compelling precedent of the first Schwegmann case are inconsequential and unimportant differences which have no relation to the underlying effect of the two acts; whereas the basic similarities in the acts upon which the constitutional issue turned in the first Schwegmann case are indisputable. What was intended to be accomplished in each act and what was in fact accomplished by the language of the enactment was a mandatory minimum mark-up of liquor prices.

The majority's unsuccessful effort to distinguish the two acts presents in bold relief its disregard for the integrity of this court's own decisions on an important constitutional question. This decision strikes a telling blow against the stability of law in this State and undermines immeasurably in law the prestige of this court.

Moreover, aside from the striking similarity of the two acts, which in itself should be sufficient to compel adherence to the first Schwegmann case, there is no justification otherwise, either factually or legally, to sustain the constitutionality of the 1964 act.

There is little pretense that the State has brought its police power to bear for the good of the public generally. It seems to be conceded that this regulation is invoked for the protection of the liquor industry which must be recognized as a very small segment of the general public. On the other hand, the rise in the price of liquor which is a consequence of this enactment undoubtedly adversely affects the public at large. It is apparent, then, to any fair-minded observer that the real object of this act is not to protect the public generally or to promote the general well-being, but, under the guise of police regulation, to interfere unduly with the fundamental rights of those opposing this act and to favor a small segment of the public—a part of a particular business—over the public generally. The result is to deprive those opposing the act of their liberty and property without due process of law.

It is said that temperance in the consumption of alcoholic beverages results from this enactment and the public good is served thereby. To begin with there is no evidence to support such a finding. On the contrary, my view of the record convinces me that the facts are otherwise, for there is no showing that the tendency for the volume of liquor sales to increase, which has prevailed for many years without interruption, has abated. An increase in the volume of liquor sales is difficult to associate with temperance in the consumption of liquor. Temperance being the only avowed benefit to the public generally and no temperance having resulted, and as none will result from such a small increase in the price of liquor (50 cents to $1.00 per fifth), it is clear that this enactment is not for the public good on the basis of temperance. This being so there is no established or discernible basis for invoking the police power of the State and curtailing the fundamental rights of citizens.

For it is the right of every citizen under the constitutional guarantees of life, liberty, the right to acquire, hold and dispose of property, and the pursuit of happiness to engage in lawful occupations without unwarranted interference by the government. This right must be protected against arbitrary interference by the State, and the legislature may not, unless the general public good requires it, impose unreasonable and unnecessary restrictions on private business.

The free enterprise and competitive systems of business which are protected by these principles will suffer much from today's decision.

I respectfully dissent.

## ON REHEARING

SANDERS, Justice:

We granted a rehearing in this case to reconsider our holding that Act 290 of 1964, relating to the sale price of alcoholic beverages, was a valid exercise of the police power. That the holding would have far-reaching effects in the field of price regulation was apparent. But also of concern to us was the assertion, in the dissenting opinions and motion for rehearing, that the Court had departed from its prior decision in Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680 (1949).

■ Under familiar principles, of course, the statute is presumed constitutional, and plaintiffs have the burden of demonstrating its constitutional infirmity. Police Jury of Parish of St. Charles v. St. Charles Par. Waterworks Dist. No. 2, 243 La. 764, 146 So.2d 800; State v. Rones, 223 La. 839, 67 So.2d 99; 16 Am.Jur.2d Constitutional Law § 137, p. 336.

As the original opinion fully recites, the assailed statute establishes minimum prices for the sale of bottled alcoholic beverages by imposing mandatory markups from cost upon both the wholesaler and retailer. The markups are stated percentages of the cost price. Depending upon the type of beverage, the wholesaler's markup ranges from ten to eighteen per cent. That of the retailer ranges from ten to thirty per cent. The cost plus the markup is termed the "list price." The statute prohibits sales below the list, or minimum, price. The general effect of the statute has been to increase the prices of alcoholic beverages.

Plaintiffs attack the statute as a coercive, price-fixing measure, outside the domain of the police power, and violative of the Due Process Clauses of the State and Federal Constitutions. They assert this minimum price statute is substantially the same as Act 360 of 1948, struck down by this Court in Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, supra, and the facts reflected in the record rebut any assumption the statute promotes temperance or any other legitimate object of the police power.

Defendants seek to sustain the statute as one reasonably designed to protect the general health, morals, and welfare of the people and, hence, a proper exercise of the police power.

Our reconsideration of the case has convinced us the price regulation scheme of this statute is substantially the same as that in Act 360 of 1948, previously condemned by this Court. Both statutes fix mandatory minimum markups for wholesalers and retailers. The 1948 statute contains somewhat higher markups. Both statutes prohibit sales below the minimum price.

Appellants suggest the price posting requirement of the 1948 statute made it a

*price-fixing* rather than a *minimum mark-up* statute. We, however, are unable to legally distinguish the two statutes on this basis. The price posting requirement of the 1948 statute seems merely an enforcement aid. In any event, the posting requirement was no factor in our 1949 decision. Throughout its opinion, the Court treated the statute as a mandatory minimum markup law and, as such, found it unconstitutional.

We have concluded, as did the eminent trial judge,[1] that the two statutes are substantially identical. Hence, the legal principles announced in Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, supra, control here. We have often cited it with approval.[2]

Quoting approvingly from American Jurisprudence,[3] the Court in that case laid down the following rule for testing the validity of a purported exercise of the police power:

"The validity of a police regulation therefore primarily depends on whether under all the existing circumstances the regulation is reasonable or arbitrary and *whether it is really designed to accomplish a purpose properly falling within the scope of the police power.*

*"In every case it must appear that the means adopted are reasonably necessary and appropriate for the accomplishment of a legitimate object within the domain of the police power.* A statute to be within this power must also be reasonable in its operation upon the persons whom it affects, must not be for the annoyance of a particular class, and must not be unduly oppressive. * * *

*"It is a general rule that in order for a police measure to be reasonable, the means adopted must be reasonably necessary and appropriate for the accomplishment of the legitimate objects falling within the scope of the power.* In order to sustain legislative interference by virtue of the police power, either by a statute or a municipal ordinance, it is necessary that the act should have some

1. The trial judge said: "I have given a very careful line by line study of Act 360 of 1948 and Act 290 of 1964. * * * I can't find any essential difference in the particular mandatory provisions, except the differences in percentages of the mark-ups."

2. See City of Baton Rouge v. Rebowe, 226 La. 186, 192, 75 So.2d 239, 241 (1954); Dr. G. H. Tichenor Antiseptic Co. v. Schwegmann Brothers Giant Super Markets, 231 La. 51, 66, 90 So.2d 343, 348 (1956); State v. Birdsell, 235 La.

396, 410, 104 So.2d 148, 153 (1958); Banjavich v. Louisiana Licensing Board for Marine Divers, 237 La. 467, 494, 111 So.2d 505, 515 (1959); Roksvaag v. Reily, 237 La. 1094, 1100, 113 So.2d 285, 287 (1959); Randolph v. Village of Turkey Creek, 240 La. 996, 1003, 126 So.2d 341, 343 (1961); State v. Goldfinch, 241 La. 958, 966, 132 So.2d 860, 863 (1961); Department of Highways v. Southwestern Electric Power Co., 243 La. 564, 584, 145 So.2d 312, 319 (1962).

3. 11 Am.Jur. Constitutional Law §§ 302 and 303.

reasonable relation to such objects, or, for more specific examples, to the public welfare or public health. *Moreover, the law must tend toward the accomplishment or promotion of such purposes in a degree that is perceptible and clear, either in preventing some offense or manifest evil or in furthering some such object.* The means employed should not go beyond the necessities of the case.

*"The mere assertion by the legislature that a statute relates to the public health, safety, or welfare does not in itself bring that statute within the police power of a state, for there must always be an obvious and real connection between the actual provisions of a police regulation and its avowed purpose and the regulation adopted must be reasonably adapted to accomplish the end sought to be attained. A statute or ordinance which has no real, substantial, or rational relation to the public safety, health, morals, or general welfare is a palpable invasion of rights secured by the fundamental law and cannot be sustained as a legitimate exercise of the police power. One application of the familiar rule that the validity of an act is to be determined by its practical operation and effect, and not by its title or declared purpose, is that a constitutional right cannot be abridged by legislation under the guise of police regulation. The exercise of the power must have a substantial basis and cannot be* made a mere pretext for legislation that does not fall within it. The legislature has no power, under the guise of police regulations, arbitrarily to invade the personal rights and liberty of the individual citizen, to interfere with private business or impose unusual and unnecessary restrictions upon lawful occupations, or to invade property rights."

See also City of Alexandria v. Hall, 171 La. 595, 131 So. 722; State v. Blake, 170 La. 175, 127 So. 592; and State v. Legendre, 138 La. 154, 70 So. 70, L.R.A.1916B, 1270.

Act 290 of 1964 contains no legislative findings and enumerates no legislative objectives. However, appellants present various arguments to establish a substantial relation between these statutory provisions and the legitimate objects of the police power: public health, morals, and welfare. These arguments may be divided into two main contentions: (1) the statute tends to promote temperance, and (2) the statute tends to prevent price wars and ruinous competition.

Initially, we note the Court rejected the identical contentions in the 1949 Schwegmann decision. The Court concluded the mandatory minimum markups did not tend, in a degree that was perceptible and clear, toward the accomplishment of the legislative purpose, and the mandatory markups were inappropriate for achieving the gen-

eral objects of the police power. Furthermore, we observe no decisive change in the economics or business climate of the liquor industry since our former decision.

Appellants' argument that the higher prices of the statute promote temperance is unfounded. The statutory price control applies only to "package" sales of distilled spirits and wines. The statute does not purport to regulate the price of alcoholic beverages sold by the drink. Nor does it touch the price of beer. It is true that two of the plaintiffs, large retail distributors, indicated their sales had dropped since the minimum price went into effect. But the suggestion that the statute reduces alcohol consumption is refuted by the evidence. The most plausible explanation in the record was the statute "split up" the business. The district court found it tended to "equalize the business" of competing dealers. It reduced the sales of the large retailer, who had previously been able to sell at a low price because of the cost advantage in quantity-buying. It increased the sales of the small outlet and corner retailer, who then because of the coercive features of the statute sold at the same price as his larger competitor. If the higher markups of the 1948 statute had no real relation to temperance, as this Court held, how can it be postulated that the present statute has?

The contention that the statute tends to relieve critical economic problems in the industry by eliminating price wars and ruinous competition is also without merit. The evidence reflects no deterioration in the economic situation of the industry since 1948. No economic crisis looms. The dealers almost invariably conceded they had prospered under the free enterprise system. Since 1948, the number of retail liquor outlets has substantially increased.

It is true the record reflects some retailers get their stock at lower costs by purchasing in large quantities. It also shows one instance of intensified competition, referred to as a "price war," in the Shreveport area about two years before the enactment of the present statute. But the situation is no different from that found prior to the 1948 statute. The evidence negates any disadvantage to the public as a whole or threat to the general welfare.

Large quantity-low price purchasing is a common practice in the distribution of most commodities in the free market. Such big-market operations have brought to the American consumer food and clothing at reasonable prices.

Price competition is severely limited in this state by the Unfair Sales Act, LSA–R. S. 51:421–51:427, prohibiting the sale of any merchandise in the regular course of business below cost. The record shows no "ruinous" competition. The competition appellants would have us hold to be ruinous has been a prime factor in the achievements of American business. More-

over, for the reasons fully assigned in our previous decision, Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, the mandatory markup in the context of this statute is not an appropriate means of preventing price wars. There we said:

> "[A]ssuming for the sake of argument that liquor price wars are possible of occurrence in this state and that stringent regulations to prevent them are needed, we do not agree that the mandatory markups provided by Act 360 of 1948 constitute appropriate means for the achievement of that purpose."

Appellants cite numerous decisions in support of the statute. Many of these are inapposite and were carefully distinguished in our previous decision. They rely particularly upon Louisiana Wholesale Distributors Assn. v. Rosenzweig, 214 La. 1, 36 So.2d 403, upholding the Louisiana Unfair Sales Law, and Schwegmann Brothers Giant Super Markets v. McCrory, 237 La. 768, 112 So.2d 606, upholding the Louisiana Orderly Milk Marketing Law. These statutes are dissimilar to the one under attack here. They prohibit sales below *cost,* composed of the expense of buying and doing business. The cost of doing business is presumed to be a stipulated statutory percentage *in the absence of proof of a lessor cost.* The retailer may sell at less than the statutory percentage if his actual cost of doing business has been less. Prohibiting sales below cost is quite different from putting the sales price itself on a steel platform.

██ We conclude the plaintiffs have discharged their burden of demonstrating the unconstitutionality of the statute. It bears no real or substantial relation to the general health, morals, or welfare of the people. At best, it represents an ignoble flight from competition. It violates. the Due Process Clauses of the State and Federal Constitutions. We hold it unconstitutional.

For the reasons assigned, the judgment of the district court is affirmed.

HAWTHORNE and HAMLIN, Justices (dissenting).

We are of the view that the judgment rendered on original hearing is correct, and we concur in the dissent of McCaleb, J.

McCALEB, Justice (dissenting).

At the outset, I find it odd that our legislature may enact price-fixing laws for milk, haircuts, all commodities and branded goods without violating constitutionally the right of freedom of contract of those businesses and trades but, when dealing with the price-fixing of intoxicating liquor, a noxious substance which may be legislatively classified as contraband, the police power becomes impotent and the limited privilege the lawmaker accords to those who seek to distribute intoxicants is somehow

transformed into a basic right of property which cannot be restricted without violating due process. Yet, that is the unseemly posture of our jurisprudence since our 1949 decision in Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L. R.2d 680 and, albeit the Court had the opportunity in this case to remedy the defect, the majority has preferred to stand fast in perpetuation of the paradox. Indeed, the majority on this rehearing feebly (in my estimation) attempts to justify its ratification of the 1949 decision by asserting that all other precedents approving price-fixing measures had substantial relation to the public good, whereas, here, it states "* * * we observe no decisive change in the economics or business climate of the liquor industry since our former decision" without even pausing to take cognizance of the fact that, as the statute must be presumed constitutional, the plaintiffs had the burden of proving that there had been no change in the economic condition of the liquor industry after 1948 and had singularly failed to offer a scintilla of evidence to show that such is the case. This is the same fundamental error committed in the 1949 decision where, as I shall hereinafter attempt to demonstrate, the Court by assertion of its own deduction and without any evidence before it on which to base such deduction, simply makes the declaration that the legislation is without public purpose. These conclusions invade the domain of the legislature, and particularly so in considering the constitutionality of minimum price-fixing statutes, since it is manifest that a more effective way of preventing price wars and unfair competition than by the device of mandatory mark-ups over cost has not yet been formulated. In truth, this is the primary reason for minimum price-fixing legislation.

In view of the fact that the majority, on rehearing, substantially sustains the main contention of plaintiffs' counsel, I will hereinafter discuss all the arguments counsel expound in an endeavor to show that they are not well taken.

A rehearing was granted in this case to consider plaintiffs' claim that we erred, for three reasons specified in the application, in sustaining the constitutionality of Act 290 of 1964.

Initially, it is declared that our original opinion is in clear conflict with the Court's prior ruling in Schwegmann Bros. v. Louisiana Board of Alcoholic Beverage Control, 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680. It is argued that, whereas it was found that the markup provisions of the 1964 Act vary in great degree from the assailed sections of the 1948 Act, there is no substantial difference between the statutes for both are simply minimum price-fixing laws and, therefore, the Court should follow our 1949 decision and hold the instant statute violative of due process.

It is unnecessary to re-examine the differences found in our original opinion upon which we based the view that the statutes were not the same. For conceding, for purposes of discussion, that the two statutes (having as their principal objects the establishment of a minimum price for the sale of intoxicating liquors) are substantially the same, it does not necessarily follow that the 1964 statute must be held unconstitutional because the 1948 statute was found invalid. The decision in the first case did not have the effect of tying the hands of the Legislature or restraining it from adopting price-fixing regulations for the sale of intoxicating liquors at any time that that branch of government found it essential to the general and economic welfare of this State so to do.

On the contrary, the many authorities cited and quoted from approvingly in our original opinion clearly exhibit that the legislative branch of government, being vested with plenary police power to prohibit the sale and distribution of intoxicating liquors, was clothed with the lesser power of regulation and was constitutionally free to enact any such measure that it, in its discretion, felt would inure to the general welfare.[1] The 1964 legislation is not in the least dependent for its validity on our 1949 decision because (as we were careful to point out in our original opinion) it must be assumed that the Legislature was well aware of the 1949 holding and found that, notwithstanding it, there were conditions obtaining in the wholesale and retail liquor business in 1964 detrimental to the economy and the general welfare which required regulation by price-fixing— a condition which this Court declared did not exist in 1948. Indeed, the 1964 statute must be presumed to be constitutional,[2] despite the 1949 decision, and the burden of showing that there is no rational relation between minimum price-fixing in the industry today and the general economy and welfare of the State, rested upon plaintiffs.[3] " 'The proper application of the (police) power cannot be measured by past

1. Mugler v. State of Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205; Crowley v. Christenson, 137 U.S. 86, 11 S.Ct. 13, 34 L.Ed. 620; Ziffrin, Inc. v. Reeves, 308 U.S. 132, 60 S.Ct. 163, 84 L.Ed. 128; Hostetter v. Idlewild Bon Voyage Liquor Corp., 377 U.S. 324, 84 S.Ct. 1293, 12 L. Ed.2d 350, 30 Am.Jur. Intoxicating Liquors, Sec. 23, p. 539.

2. Police Jury of Parish of St. Charles v. St. Charles Par. Waterworks Dist. No. 2, 243 La. 764, 146 So.2d 800; Schwegmann Brothers Giant Super Mkts. v. McCrory, 237 La. 768, 112 So.2d 606; State v. Rones, 223 La. 839, 67 So.2d 99; 16 Am. Jur. (2d) Constitutional Law, Sec. 137, p. 336.

3. Kansas City Southern Railway Company v. Reily, 242 La. 235, 135 So.2d 915; Olivedell Planting Co. v. Town of Lake Providence, 217 La. 621, 47 So.2d 23; Interstate Oil Pipe Line Co. v. Guilbeau, 217 La. 160, 46 So.2d 113; State ex rel. Kemp v. City of Baton Rouge, 215 La. 315, 40 So.2d 477; United States v. Nebo Oil Co., D.C., 90 F.Supp. 73, affirmed 5 Cir., 190 F.2d 1003; 16 C.J.S. Constitutional Law § 99, p. 407.

precedents—the test is, of course, present day conditions.'" See Louisiana Wholesale Distributors Assn. v. Rosenzweig, 214 La. 1, 11, 36 So.2d 403, 406, quoting approvingly from Wholesale Tobacco Dealers Bureau of Southern California v. National Candy & Tobacco Co., 11 Cal.2d 634, 82 P.2d 3, 9, 118 A.L.R. 485.

Plaintiffs have not attempted to shoulder the burden of establishing the unreasonableness of the legislation. Instead, they have rested their case entirely on the 1949 decision of this Court. This is insufficient to sanction a holding that the 1964 Act is invalid for the presumption of constitutionality of a statute enacted under the police power is a real presumption;[4] it is not just a legal principle to be casually stated and promptly disregarded or discarded in application. The many authorities cited

in our original opinion from the Supreme Court of the United States and this Court exemplify this rule. They declare that, whenever the Legislature, acting under its police power, has enacted regulations affecting the sale of commodities, it is not within the province of the judiciary to strike down such laws as unwise;[5] the Court's only inquiry under due process or equal protection is whether the measures are either arbitrary or discriminatory and, giving a realistic vitality to the presumption of constitutionality, the authorities hold that, if any state of facts can be imagined from which a conclusion may be drawn that there is a reasonable relation between the measure and the public good or economic condition of the business sought to be regulated, the Court is without authority to invalidate the legislation.[6]

4.  16 Am.Jur. (2d) Constitutional Law Section 142, p. 342: "As to police measures, it must be presumed that the legislature has carefully investigated and determined that the interests of the public require such legislation, for the courts are reluctant to attribute a want of good faith in the exercise of the power." Citing Durand v. Dyson, 271 Ill. 382, 111 N.E. 143; Stettler v. O'Hara, 69 Or. 519, 139 P. 743, L.R.A.1917C, 944, affd. 243 U.S. 629, 37 S.Ct. 475, 61 L.Ed. 937 (a common belief may be acted upon by the legislature in the exercise of the police power without proof of its existence); and Masonic Cemetery Asso. v. Gamage (CA9) 38 F.2d 950, 71 A.L.R. 1027, cert. den. 282 U.S. 852, 51 S.Ct. 30, 75 L. Ed. 755.

5.  Nebbia v. People of State of New York, 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940, 89 A.L.R. 1469; Northern Securities Co.

v. United States, 193 U.S. 197, 24 S.Ct. 436, 48 L.Ed. 679; Louisiana Wholesale Distributors Ass'n v. Rosenzweig, 214 La. 1, 36 So.2d 403; 16 Am.Jur. (2d) Sec. 163, p. 371; Black on Constitutional Law, 4th Ed. p. 426.

6.  16 Am.Jur. (2d) Constitutional Law, Section 143, p. 343: Black on Constitutional Law, 4th Ed. p. 424 (" * * * a statute attributable to the police power must be sustained if any state of facts can reasonably be presumed, or even conceived, which would justify it."); City of Shreveport v. Cunningham, 190 La. 481, 182 So. 649; Alabama State Federation of Labor v. McAdory, 325 U.S. 450, 65 S.Ct. 1384, 89 L.Ed. 1725; Rast v. Van Deman & Lewis Co., 240 U.S. 342, 36 S.Ct. 370, 374, 60 L.Ed. 679, L.R.A.1917A, 421, Ann.Cas.1917B, 455 "(It is established that a distinction in legislation is not ar-

Apart from this, however, if it be assumed that the economic conditions in the liquor distribution business in this State were the same in 1948 as they are today—that is, that there was a considerable disparity in prices because of the method of business (purchase at wholesale and resale directly to the consumer) employed by the plaintiffs and other cut-rate establishments (it is shown in our original opinion that Schwegmann has had retail sales as high as $5,000,000 per year and Reynolds as high at $2,000,000) then our 1949 decision is incorrect and should not be followed. For, surely, when due consideration is given to the almost unlimited power of the Legislature to regulate the distribution of intoxicating liquor, it can hardly be said that it is unreasonable for it to provide minimum sale prices so that the small corner retailer is able to compete with the larger super-market and other cut-rate distributors, and thus reduce the possibility

that the latter would eventually monopolize the package sale distribution of intoxicants in the State [7] or that such price fixing regulation does not have a real relation to the economic and general welfare of the people.

Our 1949 decision that regulatory price-fixing for the distribution at wholesale and retail of intoxicating liquors appears to be in conflict with the rationale of our prior decisions in the Parker case, 190 La. 214, 182 So. 485, upholding the constitutionality of price-fixing of hair cuts under a regulatory law for the barber trade; Pepsodent Co. v. Krauss Co. Ltd., 200 La. 959, 9 So. 2d 303, price-fixing for the marketing of trademark or brand goods; the Rosenzweig case, 214 La. 1, 36 So.2d 403, providing for 6% markups over cost on the sale of all commodities and our later decision in the McCrory case, 237 La. 768, 112 So.2d 606, involving price-fixing for the sale of milk.

bitrary, if any state of facts reasonably can be conceived that would sustain it, and the existence of that state of facts at the time the law was enacted must be assumed.")

Note that in the following cases price-fixing statutes enacted by the Legislature have been upheld by this Court: Board of Barber Examiners of Louisiana v. Parker (Act 48 of 1936, R.S. 37:411 et seq.) 190 La. 214, 182 So. 485; Pepsodent Co. v. Krauss Co. Ltd., (Fair Trade Act, Act 13 of 1936, R.S. 51:391 et seq.) 200 La. 959, 9 So.2d 303; Louisiana Wholesale Distributors Ass'n v. Rosenzweig (Unfair Sales Act, Act 338 of 1940, as amended, R.S. 51:421 et seq.) 214 La. 1, 36 So.2d 403 and Schwegmann

Bros. Giant Super Mkts. v. McCrory, (Orderly Milk Marketing Act, Act 193 of 1958, R.S. 40:940.1 et seq.) 237 La. 768, 112 So.2d 606.

7. In Schwegmann Bros. Giant Super Mkts. v. McCrory, 237 La. 768, 112 So.2d 606, this Court held the provisions of Act 193 of 1958 (Orderly Milk Marketing Act) constitutional, relying upon Louisiana Wholesale Distributors Ass'n v. Rosenzweig, supra, in which it is stated: "[I]n adopting this state's Unfair Sales Act for the protection of our economic structure and to prevent the creation or perpetuation of monopolies, the legislature was acting well within its police power." 214 La. at page 14, 36 So.2d at page 407.

Likewise, it appears that that decision stands practically alone in its holding that price-fixing legislation, when applied to sales of intoxicating liquors, has no real relation to the public interest.[8] An examination of the holding (see 216 La. 148, 43 So.2d 248, 14 A.L.R.2d 680) will disclose that the Court, after recognizing the principle that an act of the Legislature is presumed to be legal and that the judiciary is without right to declare a law unconstitutional unless this is manifest, actually employed the presumption in reverse and placed the onus of proving reasonable relationship between the measure and the public welfare upon the defendant State agency. Under the facts adduced by the defendant Board in that case, it would have been an easy matter for the Court to have upheld the validity of the 1948 law, had real efficacy been given to the presumption of constitutionality, for, from those facts many situations could have been readily conceived from which it could have been concluded that there was a real and substantial relation between the liquor price-fixing regulation and the social, economic and general welfare.

Our 1949 ruling has been cited to courts of other jurisdictions on more than one occasion but has never been followed.[9] And at least one court of last resort (see Dundalk Liquor Co. v. Tawes (1953) 201 Md. 58, 92 A.2d 560) and a constitutional law writer [10] have noticed the failure of our decision to give force and effect to the presumption of constitutionality and to recog-

---

8. Arkansas—Gipson v. Morley, 217 Ark., 560, 233 S.W.2d 79; Connecticut—Schwartz v. Kelly, 140 Conn. 176, 99 A.2d 89, app. dismissed 346 U.S. 891, 74 S.Ct. 227, 98 L.Ed. 394; Beckanstin v. Liquor Control Comm., 140 Conn. 185, 99 A.2d 119; Kentucky—Reeves v. Simons, 289 Ky. 792, 160 S.W.2d 149; Massachusetts—Supreme Malt Products Co. v. Alcoholic Beverages Control Comm., 334 Mass. 59, 133 N.E.2d 775; Maryland—Dundalk Liquor Co. v. Tawes, 201 Md. 58, 92 A.2d 560; New Jersey—Butler Oak Tavern v. Division of Alcoholic Bev. Con., 20 N.J. 373, 120 A.2d 24; Gaine v. Burnett, 122 N.J.L. 39, 4 A.2d 37; Ohio—Pompei Winery Inc. v. Board of Liquor Control, 167 Ohio St. 61, 146 N.E. 2d 430; Blackman v. Board of Liquor Control, 95 Ohio App. 177, 113 N.E.2d 893, app. dismissed 158 Ohio St. 368, 109 N.E.2d 475; California—Allied Properties v. Dept. of Alcoholic Beverage Control, 53 Cal.2d 141, 346 P.2d 737. It was held in Dave's Market Inc. v. Dept. of Alcoholic Bev. Control, 222 Cal.App.2d 671, 35 Cal.Rptr. 348 that a statute requiring intoxicants to be sold at fair trade prices was within the police power and not invalid under due process provision nor as unlawful delegation of price-regulating powers to private persons. Rhode Island—Nocera Bros. Liquor Mart, Inc. v. Liquor Control Hearing Board, 81 R.I. 186, 100 A.2d 652.

9. See Dundalk Liquor Co. v. Tawes (1953) 201 Md. 58, 92 A.2d 560; Blackman v. Board of Liquor Control (1952) 95 Ohio App. 177, 113 N.E.2d 893, App. dismissed 158 Ohio St. 368, 109 N.E.2d 475; Allied Properties v. Board of Equalization (Cal. App.1959) 338 P.2d 1013, affirmed 53 Cal.2d 141, 346 P.2d 737.

10. See Comment by the late Charles A. Reynard, Associate Professor of Law, Louisiana State University, in Vol. 11, Louisiana Law Review, 197–203.

nize that, in absence of a clear showing that the act could not serve the end sought to be attained and could only cover ulterior objects of its proponents, it is the province of the Legislature to determine the necessity for the police measure and whether or not the means used to accomplish the object of the law is proper.

Next, plaintiffs' counsel profess that our holding that price-fixing promotes temperance is not sound and they say that higher liquor prices do not tend to lessen the demands of the consumer. From this premise, it is concluded that the present law is simply a subsidy for the small liquor dealer.

The correctness of the assertion that higher prices for intoxicating liquor does not tend to promote temperance is, to say the least, debatable. For I think it manifest that any hike in price of liquor may act as a deterrent to its purchase and ultimate consumption to some degree. Here, again, in judging the reasonableness of the legislation the Court should not consider the amount of temperance the mark-ups will produce for this, of course, relates to the wisdom of the means employed to promote temperance; may be a doubling or tripling of the minimum retail price would effect much less consumption but this is purely a matter of legislative discretion with which the courts are not concerned.

Furthermore, it seems obvious that, when counsel for plaintiffs speak of the public interest and argue the lack of effect of this legislation upon the social, moral and economic welfare, they are referring to that segment of the people who purchase intoxicating liquors for their own consumption. Evidently, counsel regard those members of the public who neither imbibe intoxicants nor those who are not purchasers of packaged liquors (which I daresay comprise an appreciable segment of our people) are not within the ambit of the "public" embraced by the statute and need no protection from regulatory laws. But those people do have an interest to serve and the Legislature, in the nature of things, has a right and duty to consider their well being—for it cannot be doubted that the excessive consumption of intoxicating liquor tends to adversely affect the moral, social and general welfare of the people at large.

Finally, plaintiffs complain that the Court failed to consider on first hearing the charge in their petitions that Act 290 of 1964 was violative of Article 3, Section 1 of the Constitution, as well as Article 1, Section 2 thereof and the Fourteenth Amendment to the United States Constitution, in that it unlawfully delegates rights and powers to producers to fix certain prices and define certain criminal conduct punishable under the provisions of the statute.

Plaintiffs are mistaken in their claim, as the original opinion did consider the contention of unlawful delegation of legisla-

tive power and found it to be without merit. It is true that the Court did not discuss the charge in detail but this was due to the fact that it was not briefed by plaintiffs' counsel and only casually mentioned during the first argument.

At any rate, a careful examination of plaintiffs' contention that the Legislature has delegated to the producer of the intoxicating liquor the power to fix the price, because the Act requires the wholesaler and retailer to add a minimum markup to the cost price they pay for the liquor, shows it to be patently untenable. The cost of liquor to the wholesaler or retailer results from a commutative contract of sale. The producer does not fix the price for those who are not parties to the contract, as was the case in Dr. G. H. Tichenor A. Co. v. Schwegmann Bros. G. S. Mkts., 231 La. 51, 90 So.2d 343 where we held that the Legislature had unconstitutionally delegated its power to fix prices to the producer when it attempted to bind subsequent purchasers of the commodity to conditions relating to the resale price contained in contracts of sale to which they were not a party. The other cases cited by plaintiffs on this point are likewise inapposite.

Furthermore, no delegation of power whatever is given to the manufacturer with relation to the markups; they have been fixed by the Legislature itself. The markups are a fixed percentage of the cost and apply to wholesalers and retailers respectively. The Legislature is not attempting to fix, as it had power so to do if it saw fit, the purchase price to be paid by the wholesaler or retailer to the producer; it only fixed the minimum markup that must be charged by the wholesaler and retailer above their cost. In essence, no legislative power is delegated to anyone.

In conclusion, however objectionable the act of the Legislature fixing a minimum sale price of intoxicating liquors may be to the purchaser or the seller, however great may be the disapproval of the act by a majority of the people, however unpopular the enforcement of the act may be, the fact remains that in regard to this act the Court's only function is to determine whether it is constitutional and legal. I believe that the Court, on first hearing, properly concluded that the statute, dealing as it does with the distribution of a commodity over which the Legislature has the admitted plenary power to regulate and may even prohibit, was clearly within the scope of police power and did not violate any constitutional right vouchsafed to plaintiffs. It is not a judicial function to strike down a law because it is unpopular. If the provisions of the act are objectionable to the people of this State, their redress is to seek repeal by the Legislature, for repeal is a legislative and not a judicial function.

I respectfully dissent.