Dear Mr. Ratcliff:
This office is in receipt of your request, on behalf of the Livingston Parish Council, for an Attorney General's opinion regarding several issues pertaining to the Parish's contract with Waste Management, Inc. for the operation of Livingston Parish's Woodside Landfill.
According to your correspondence, the Parish and American Waste and Pollution Control Company, now Waste Management, entered into an agreement styled Sanitary Landfill Operating and Maintenance Agreement (the "Agreement"), regarding the Parish's landfill. The Agreement is dated December 15, 1986. An amendment to that agreement was entered into on August 9, 1988 (the "Amendment"). The Amendment authorizes American Waste and Pollution Control to operate a landfill adjacent to the Woodside site. In return for this authorization, Livingston Parish is to receive five (5%) percent of the gross revenues generated by operation of Waste Management's landfill. The Agreement and the Amendment are sometimes collectively referred to herein as the "Amended Agreement".
You have asked this office to examine the contractual responsibilities of Waste Management, as the operator of the Woodside Landfill, and the Parish, as owner of the Woodside Landfill with regard to closure and post closure activities, and the costs associated therewith. Additionally, you have asked for an opinion regarding the length of time the Parish will be entitled to collect royalties generated by Waste Management's operation of its own landfill. In order to address these issues, we have reviewed the Agreement and the Amendment, which you provided with your request. Specifically, we have been asked to respond to four separate questions.
Before addressing those questions, we are compelled to point out that our opinion herein is based upon an examination of the contractual arrangement between the Parish of Livingston and American Waste and Pollution Control Company, now Waste Management, as set forth in the Amended Agreement. This opinion does not address the responsibilities of the Parish and/or Waste Management to third parties and/or state and federal governmental entities in connection with the landfill and waste disposal activities conducted thereon. Furthermore, as our examination is limited to an examination of the Amended Agreement, this office has not considered or examined the permit(s) issued by the Department of Environmental Quality for operation of the Parish landfill, nor have we considered or examined the rules or regulations of the Department of Environmental Quality or of any Federal Agency, for purposes of this opinion.
We believe the following rules of statutory construction to be applicable to the issues you have presented for our review, and we were guided by them in providing answers to your questions:
As a general rule, contracts form the law between the parties thereto and are given legal effect according to the expressed intentions of the parties as contained therein.Sartor et. al. v. United Carbon Co., 163 So. 103 (La. 1935);Falco Lime, Inc. v. Plaquemine Contracting Co., Inc.,672 So.2d 356 (La.App. 1 Cir. 1996). When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent. La. Civ. Code Art. 2046. Such intent is to be determined in accordance with the general, ordinary, plain and popular meaning of the words used in the contract unless the words have acquired a technical meaning. Ledbetter v. Concord GeneralCorp., 665 So.2d 1166 (La. 1996) (citing La. Civ. Code Art.2047). If the wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written.Ledbetter, 665 So.2d 1166 (citing Pareti v. Sentry IndemnityCo., 536 So.2d 417 (La. 1988). Each provision of a contract must be interpreted in light of the other provisions so that each is given the meaning suggested by the contract as a whole. FalcoLime, 672 So.2d 356 (citing La. Civ. Code Art. 2050). A contract should not be interpreted in an unreasonable or strained manner so as to enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Reynolds v. Select Properties, Ltd.634 So.2d 1180 (La. 1994).
1. Is Waste Management or Livingston Parish responsible for closure of the Parish's Woodside Landfill?
In our opinion, Waste Management, and not the Parish, is responsible for closure of the Woodside landfill and the costs associated therewith. The Agreement appears to us to contemplate that Waste Management will "cover" solid waste at the landfill, and will be responsible for "closure" if Waste Management is operator of the Landfill at the time of closure. In reaching this conclusion, we found the following provisions of the Agreement to be controlling:
 "From and after Commencement Date, Contractor shall, to the extent required herein, at its expense:
 * * *
 (ii) Place, compact and cover Solid Waste received at the Sanitary Landfill in accordance with the Permit;" (Agreement — paragraph 3.B.(ii)). (Emphasis added).
This provision indicates that all Solid Waste will be covered by Waste Management in accordance with the requirements of the Permit. It is our understanding that providing proper coverage of Solid Waste is an important aspect of closure.
 "From and after Commencement Date and during the term of this Agreement and any extension thereof, Contractor shall respond to and, to the extent necessary, correct all violations and charges of violations of laws, ordinances and regulatory requirements occasioned by Contractor's construction operation, maintenance and, if applicable, closure of the Sanitary Landfill. (Agreement — paragraph 3.F.) (Emphasis added).
This provision indicates that the Parties to the Agreement contemplated that Waste Management would perform "closure" of the landfill, as well as respond to and correct violations connected therewith, as contemplated by the regulations, if "closure" occurred "during the term of this Agreement or any extension thereof".
 "Upon closure and seeding of the Sanitary Landfill, as provided above, Parish, upon request, will provide Contractor with a letter or other document satisfactory to Contractor affirming satisfactory completion of Contractor's duties under this Agreement and releasing Contractor from any and all further, future and additional obligations with respect to the Sanitary Landfill and under this Agreement provided, however, such release shall not operate to relieve Contractor of any liability assumed pursuant to paragraph 6 with respect to Contractor's services rendered hereunder. (Agreement — paragraph 4) (Emphasis added).
This provision indicates that Waste Management's services include closure and seeding. If the parties did not intend for Waste Management's services to include closure and seeding, there is no apparent reason why the release contemplated by this paragraph would not issue until after closure. If Waste management was not responsible for closure, the release could be issued upon completion of Waste Management's services short of closure.
 " . . . Contractor shall indemnify, defend and save harmless the Parish from any loss, claim, liability occasioned or arising solely out of or relating solely to the acts or omissions, whether negligent or willful, of Contractor in the performance of the work herein specified, including but limited to, contamination of or adverse effects on the environment, if any, occasioned by the construction engineering, re-design, maintenance, operation, closure and post-closure (if applicable) of the Sanitary Landfill." (Agreement — paragraph 6) (Emphasis added).
This provision indicates that the Parties to the Agreement contemplated that Waste Management would perform "closure" of the landfill, and hold the Parish harmless in connection therewith.
 "This Agreement, together with the Exhibits referenced herein and attached hereto and the Permit, all of which are incorporated herein by reference, constitute the entire agreement and understanding between the parties hereto, with respect to the operation and closure of said Sanitary Landfill, and it shall not be considered modified, altered, changed or amended in any respect unless in writing and signed by the parties hereto." (Agreement — paragraph 18) (Emphasis added).
This provision indicates that the Parties intended the Agreement to cover services for closure of the landfill.
 "(d) In order to fulfill the requirements of the Louisiana Solid Waste Rules and Regulations, Section 7.3.2.E (as amended), the Contractor shall deposit into a trust account with the financial institution selected by the parish the initial sum of 6,000.00. Additional payments will be made each year The amount of the annual payment to the trust will be determined according to the plan outlined in the Permit. The trust fund and interest accruing to it will become the property of the Parish as additional security for the full performance of closure, but will be held in trust with the "Administrative Authority" of the State Department of Environmental Quality as the beneficiary. The trust fund may be used for no purpose other than closure of the landfill until such time as the landfill has been closed in full compliance with the regulation and "Administrative Authority" releases the remainder of the trust fund to the Contractor in full". (Agreement — Exhibit F) (Emphasis added).
This provision, which requires Waste Management to provide security for the performance of closure, indicates the Parties' intention that Waste Management would actually perform closure.
2. Is Waste Management or Livingston Parish responsible for the post closure of the Parish's Woodside Landfill?
It is the opinion of this office that the Amended Agreement places responsibility for post closure of the landfill and the costs associated therewith on the Parish of Livingston.
Among the materials you forwarded to us was a letter from Mr. A. Shelby Easterly, III dated March 23, 1999. We agree with Mr. Easterly's conclusion that the provisions of numbered paragraph 3 of the Agreement are dispositive of this issue, and we do not believe we can state the reasoning for this conclusion any more succinctly than Mr. Easterly has. Therefore, this office adopts the conclusions reached in Mr. Easterly's opinion, as follows:
 "We believe the provisions of numbered paragraph 3 of the Operating and Maintenance Agreement are controlling with respect to the inquiry and issue presented.
 First, subparagraph 3. A. specifies the contractor's obligation to "commence performing the maintenance and operational services" in the specific language that follows:
 Upon the receipt of all necessary governmental approvals, Contractor shall commence performing the maintenance and operational services at the Sanitary Landfill in conformance with the Permit. The date on which Contractor commences performing the first of such services shall hereinafter be referred to as the "Commencement Date." (emphasis added)
Pursuant to subparagraph 3.B. the contractor's mandatory performance requirements are specified and, significantly, there is no specification of any requirement for post closure obligation(s). At the same time, under paragraph 3.D. the Parish is obligated for "any other obligation or activity . . . not specifically required of contractor" under the agreement.
In our opinion, subparagraph 3.D. is a simple English expression of the maximum inclusio unius est exclusio alterius, that is the inclusion of one is, by definition the exclusion of others. In other words, the inclusion of "maintenance and operational services" is the exclusion of other obligations, such as "post closure" responsibility. While other provisions of the agreement impose obligations (eg. Paragraph 6, Indemnification; Paragraph 7, Insurance; Paragraph 8, Utilities; etc.) these do not impose requirements beyond the concept of "maintenance and operational services.".
This is supported by the provisions of Paragraph 4 concerning the "Term" of the agreement which specifically provides that "upon closure and seeding of the Sanitary Landfill" the Parish will provide evidence of the contractor's satisfactory completion of its duties and further releasing the contractor from any further obligations concerning the landfill, save and except only the liability assumed in paragraph 6 of the agreement concerning indemnification, which provisions impose no responsibility for post closure obligations.
It is further significant that while the Operating and Maintenance Agreement contains only one specific reference to "post closure" matters, insofar as that reference is concerned, the "post closure" reference is modified by the words "if applicable". (See Paragraph 6, entitled Indemnification which provides for indemnification of the Parish "from any loss occasioned or arising solely out of the acts or omissions of Contractor occasioned by the construction engineering, re-design, maintenance, operation, closure and post-closure (if applicable) of the Sanitary Landfill.") Of course, the Operating and Maintenance Agreement imposes no post closure obligation upon the contractor, particularly as shown by the references to Paragraphs 3 and 4.
Likewise, the Bond for performance and other requirements set forth in Exhibit F are only "security for the performance of [Contractor's] covenants . . . in this Agreement." See Operating and Maintenance Agreement at Paragraph 15. As a security agreement it is an ancillary obligation and totally dependent on the primary (or contractually specified) obligations. Further, to the extent it serves as a suretyship for any post closure obligations, the Company has a right of recovery from its principal, the Parish.
The provisions of the Amendment to Agreement, dated August 9, 1998 do not modify, change or effect the foregoing provisions.
As stated above, it is our opinion, based upon the contractual agreement(s) presented, that Waste Management, Inc., as successor to American Waste and Pollution Control Company, has no obligation for any "post closure" obligation concerning the Woodside Landfill. As a matter of contract, this responsibility is reserved to the Parish under paragraph 3.D."
3. Under the terms of the Amendment, how long would Livingston Parish be entitled to collect a five (5%) percent royalty from Waste Management's operation of a new landfill facility adjacent to the Parish's landfill?
Paragraph "c." of the Amendment pertinently provides:
 "Upon the commencement of Waste disposal on the additional acreage occurring during the term of the original agreement or any extension thereof, the credit due the Parish in the amount of 5% of gross revenues as provided in Exhibit D attached to the original agreement entitled "Credit to Parish for sums due to Contractor", shall apply to sanitary landfill operations on the additional acreage." (Emphasis added)
In our opinion, the italicized language indicates that this credit, or royalty, will be payable to the Parish until expiration of the term of the Amended Agreement.
In an attempt to determine when the Amended Agreement expires, we have examined paragraph 4 of the Agreement, which pertinently provides: "This agreement shall be effective on the date hereof and continue for ten (10) years or until expiration of the Permit whichever shall first occur. At Contractor's option, Contractor may on behalf of owner and at Contractor's expense, seek extension of the Permit and if successful such Permit extension or extensions shall operate to extend the term hereof for a maximum of ten (10) additional years."
It is our understanding that the Agreement was extended for ten (10) years by renewal of the Parish's landfill permit until the year 2006. It is our opinion that the Parish is entitled to receive the five (5%) percent credit or royalty until December 14, 2006. Of course, since the royalty provided for in the Amended Agreement is based upon the revenues to be received by Waste Management in connection with the operation of its landfill, no royalty will be due if Waste Management does not commence those waste disposal activities.
4. Could action by the Livingston Parish Council to formally oppose Waste Management's application for a new permit to operate a landfill facility on the acreage adjacent to the Parish's landfill be considered a breach of the Amended Agreement?
The Parish of Livingston has, as its paramount responsibility, the health and welfare of its citizens, and it is our opinion that the Parish cannot contract away its police powers. A contract provision that would hamper the ability of the Parish to protect the health welfare of its citizens would becontra bones mores.
 "Not only are existing laws read into contracts in order to fix obligations as between the parties, but the reservation of essential attributes of sovereign power is also read into contracts as a postulate of order. Into all contracts, whether made between states and individuals or between individuals only, there enters the condition, regardless of whether it is carried into express stipulation, that the state may not bargain away or otherwise be prevented from exercising its police power, viz. the exercise of the sovereign right of the government to protect the lives, health, morals, comfort and general welfare of the people." Board of Com'rs. v. Dept. of Natural Resources, 496 So.2d 281 (La. 1986).
The Amended Agreement must be construed in a manner that is consistent with the Parish's responsibility for the safety and well-being of its citizens. Therefore, if Waste Management proposes a facility that will operate in a manner threatening to the health and safety of Livingston's citizens, we believe that the Parish Council could and should object to the issuance of such a permit. Furthermore, it is our opinion that such an objection would not be a breach of the Amended Agreement.
We also note that Waste Management's predecessor agreed to certain terms and conditions in favor of the Parish. Notably, American Waste and Pollution Control agreed not to operate an incinerator, an injection well or a Hazardous Waste facility. If it appears that Waste Management intends to obtain permits in violation of these or other provisions of the Amendment, or if the permit is sought in violation of any of the covenants Waste Management or its predecessor has made to the Parish, then the Parish could certainly object to the Permit on those grounds.
We do, of course, caution the Parish against taking action which could be considered as arbitrary or capricious opposition to Waste Management's application for a permit to operate a landfill facility on its acreage adjacent to the Parish facility. The exercise of police power by the state or a political subdivision must be reasonable, as well as designed to accomplish a purpose properly falling within the scope of the police power. Wes-T-Erre Development Corp. v. Terrebonne Parish,etc., 416 So.2d 209 (La.App. 1st Cir, 1982), citing Hi-LoOil Company v. City of Crowley, 274 So.2d 757 (La.App. 3rd
Cir. 1973), writ refused 277 So.2d 673 (La. 1973) and Reynoldsv. Louisiana Board of Alcoholic Bev. Con., 185 So.2d 794 (La. 1965). Since the primary purpose of the Amendment was to authorize American Waste and Pollution Control to proceed with the acquisition of the necessary land and permits for the operation of its landfill, opposition for reasons other than the exercise of the Parish's police power could be construed as a breach of contract.
We trust the above and foregoing to be helpful to the Parish and responsive to its questions. Should you or the Parish need assistance in other areas of the law, please do not hesitate to contact us.
Yours very truly,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: _______________________________________________ JEANNE-MARIE ZERINGUE BARHAM Assistant Attorney General
RPI:JMZB:jv